THE T. K. HARRIS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78711.   Promulgated August 24, 1938.

*John G. Ketterer, Esq.*, and *C. R. Cox, C. P. A.*, for the petitioner.
*Elmer Corbin, Esq.*, for the respondent.

#### OPINION.

LEECH: The respondent determined a deficiency in income taxes against the petitioner for the fiscal year ended March 31, 1932, in the amount of $1,455.01, together with a delinquency penalty of $656.33. The returns of petitioner were filed with the collector of internal revenue at Cleveland, Ohio.

The proceeding was submitted on a stipulation of facts. We find the facts as stipulated.

For present purposes, the essential facts follow. On September 29, 1930, the petitioner contracted with the East Ohio Gas Co., hereinafter called Gas Co., to drill completed gas wells upon the property of the petitioner. This contract provided in the preamble, inter alia:

WHEREAS, the * * * [Gas Co.] is engaged in the business of selling gas and desires to procure whatever natural gas that can be procured from the land hereinbefore described, and

WHEREAS, the * * * [petitioner] desires that there be taken from said land and marketed as soon as possible all the natural gas, oil, casing head gasoline and any other products that may be obtained from said land incidentally in drilling for gas * * *.

The contract named no definite sum of money as the cost of any well nor was there any limitation as to the depth to which any of the wells was to be drilled. The wells were to be "deemed completed when gas turned into pipe lines." All the wells were to be drilled "at * * * [Gas Co.'s] sole expense, including labor and material." The petitioner assumed no personal liability for the same but it was agreed that the Gas Co. should be reimbursed for its "exact cost without overhead" solely from the proceeds of the sale of gas from the particular well. If there was any deficit as to any well that loss was to be sustained by the Gas Co. "The wells and all the material in connection with the same shall become and be the property of * * * [the petitioner] after * * * [Gas Co.] has been reimbursed for the cost thereof as aforesaid, except that if a dry hole is struck, then the * * * [Gas Co.] shall remove the pipe, fixtures and derrick from the premises within thirty (30) days after it appears that the hole is dry and all the material removed shall remain the property of * * * [Gas Co.]."

Until the cost of each completed well was paid, the Gas Co. was to sell the production therefrom and credit the petitioner's drilling account therewith. After the cost of each completed well was paid, the Gas Co. agreed to operate the well and buy the production from petitioner under specified conditions.

Pursuant to this contract, the Gas Co. drilled six wells upon the property of the petitioner, the proceeds of the gas produced from none of which was sufficient to pay the drilling, development, and operating costs prior to the end of the fiscal year ended March 31, 1932, but three of them had been completed and put into production prior to the end of that fiscal year. All these wells, before 1935, produced sufficient gas, the proceeds from which completely reimbursed the Gas Co. for its drilling, development, and operating costs.

During the time these wells were being drilled and after drilling, the Gas Co. furnished the petitioner with detailed invoices of the exact amounts expended in the development, drilling, and operation of the wells. After the first well was completed and put into production, the

Gas Co. started a ledger account in its records against the petitioner in which the items appearing upon the invoices rendered to the petitioner for the cost of drilling, developing, and operating the wells, were charged as an account receivable against the petitioner.

Periodically, as these invoices were submitted by the Gas Co. to the petitioner, while the wells were being drilled, the items of expense therein were allocated between tangible and intangible drilling costs by the petitioner "in accordance with the regulations of the Commissioner of Internal Revenue." In the original return filed by the petitioner for the fiscal year ended March 31, 1932, the petitioner returned no income from the wells completed and put into production during that year. The taxes due under this return were paid. By amended return it reported, as income, the proceeds of gas sold from the three completed wells in the fiscal year in question, charged to expense certain amounts as intangible costs of drilling and developing all the wells, and claimed depreciation on certain amounts as tangible costs, in conformity with an allocation by petitioner. The respondent, in determining the deficiency, included in the petitioner's gross income for the fiscal year, the amounts credited to the petitioner by the Gas Co. during that year for gas produced on completed wells on the petitioner's property, in the total amount of $15,736.86, from which operating expenses of $21.50 and percentage depletion of $4,327.64 were deducted, leaving a net income of $11,387.72. The penalty of $656.36 was added because of petitioner's failure to file its income tax return within the statutory period. That penalty is not in controversy.

The petitioner now claims its taxes for the taxable year were overpaid.

The only issues pleaded are: (1) Whether petitioner received income in the amounts credited to petitioner by the Gas Co. as proceeds of the gas produced from its three gas wells completed during the fiscal year ended March 31, 1932; (2) if it did receive such income, has it the right to deduct from that gross income, as an expense, the intangible drilling and development costs, during that period, of all the wells, under article 236, Regulations 77? (3) is petitioner entitled to a deduction for depreciation on the physical property in the three completed gas wells, under the provisions of article 238, Regulations 77?

The first two contentions of petitioner are without merit.

Petitioner owned the leases on which the wells were drilled. It did not transfer any interest in them nor the mineral in place to the Gas Co. That company merely agreed to and did drill wells for petitioner on petitioner's property. Cf. *Edwards Drilling Co.*, 35 B. T. A. 341; affd., 95 Fed. (2d) 719; *Cook Drilling Co.*, 38 B. T. A. 291. Petitioner agreed to pay for these wells in the future by assignment of its income from a particular source. If none of the drilling resulted in

commercial wells, there would have been no capital improvement in fact, and no obligation of petitioner to pay therefor, and consequently no income to it. *Bliss* v. *Commissioner*, 57 Fed. (2d) 984. However, when such drilling did result in commercial wells, there was a capital improvement which accrued to petitioner and income to it from its leases resulted.

The proceeds of the production from the three wells, completed in the taxable year, collected by the Gas Co. and applied to the payment of the cost of these wells, in accordance with the contract, was income, constructively received by petitioner, and taxable to it, before that income could pass to the Gas Co. by virtue of the assignment of that income in the contract. *Reynolds* v. *McMurray*, 60 Fed. (2d) 843; certiorari denied, 287 U. S. 664.

Petitioner's right to charge any amount to expense as intangible drilling and developing costs, under Regulations 77, article 236, depends upon whether such costs were incurred in a "footage drilling" contract or under a "turn-key" contract for the purchase of completed wells. *C. W. Titus, Inc.*, 32 B. T. A. 1222.

Here, all the labor and material involved in the drilling of each well was furnished solely by the Gas Co. The contract was for completed wells, only. Petitioner was not liable in any event, except for a completed well. And, its obligation then was fixed, not upon any footage basis but by the "exact cost without overhead" of each well and the proceeds of production therefrom. We conclude, therefore, that the contract under which the wells were drilled was, in effect, a "turn-key" contract and petitioner purchased capital assets, thereunder, in the form of completed wells. It follows that respondent was correct in denying petitioner its asserted claim to charge intangible drilling costs in connection therewith, to expense. *C. W. Titus, Inc., supra; O-W-R Oil Co.*, 35 B. T. A. 452. This conclusion is not disturbed by the stipulation that the items of expense incurred in the drilling of the wells were allocated as tangible and intangible drilling costs by the petitioner "in accordance with the regulations of the Commissioner of Internal Revenue." In our judgment, that stipulation here has no more effect than the stipulation in *O-W-R Oil Co., supra*. In that case it was stipulated that the amounts thus allocated by the taxpayer were "reasonable and proper." At all events, we do not think we are bound by that statement in the stipulation in view of the drilling contract and expense invoices, likewise in the record. See *Wm. Ernest Seatree*, 25 B. T. A. 396; affd., 72 Fed. (2d) 67. Under that contract, an allocation of such expenses between tangible and intangible drilling costs is just as impossible as it was in *O-W-R Oil Co., supra*. In that case this Board said: "No actual segregation of tangible and intangible drilling expenses of the taxpayer, under such a contract, can be made. [Citations.]"

The petitioner's third contention merely raises the question of when its right to depreciation begins.

The drilling of each well was the business of the Gas Co. *Edwards Drilling Co., supra; Cook Drilling Co., supra.* But, upon the completion of each well and its producing gas, the operation of that well, became the business of petitioner. The proceeds from that business, as we have said, was the income of petitioner. The Gas Co. merely, operated such completed wells for petitioner and bought the production under the agreement. It is true, under its contract, the legal title to each completed well did not vest in petitioner until its cost was paid. However, legal title is not necessary to support a depreciation deduction. *F. & R. Lazarus & Co.*, 32 B. T. A. 633 (on appeal C. C. A., 6th Cir.), and cases cited therein. The completion of each well resulted then in a capital improvement to petitioner for which petitioner was paying by assignment of its income therefrom. It then had a proprietary and equitable interest in that capital improvement. The Gas Co. held legal title only as security for the payment of the costs of the well, in conformance with the contract. From its completion, each well was used in petitioner's business to produce its income upon which, as such, we have here sustained a tax. The claim for depreciation is sustained. See *F. & R. Lazarus & Co., supra,* and cases cited therein; *Exolon Co.* v. *United States* (not reported) (Dist. Ct., Mass., Sept. 3, 1931).

*Decision will be entered under Rule 50.*