FIGGIE INTERNATIONAL, INC. (SUCCESSOR BY MERGER TO MID-CONTINENT MANUFACTURING CO., INC. AND SUBSIDIARIES), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Figgie International, Inc. v. Commissioner
Docket No. 12627-79.
United States Tax Court
T.C. Memo 1985-369; 1985 Tax Ct. Memo LEXIS 265; 50 T.C.M. (CCH) 509; T.C.M. (RIA) 85369; July 23, 1985. Andre M. Saltoun,Neal J. Block, and James M. O'Brien, for the petitioner. Judy Jacobs, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: Taxable Year or
Period Ending
Deficiency
June 30, 1968
$749,592.24
June 30, 1969
14,252.58
Oct. 29, 1969
10,885.03
Subsequent to a merger on September 25, 1967, and at all times prior to October 29, 1969, Huber Corporation (Huber) and its wholly owned subsidiary, Huber-American, Inc. (Huber-American), as well as Huber-Warco do Brasil, S.A. (Huber-Warco), a Brazilian corporation wholly owned by Huber and Huber American, were subsidiaries of Mid-Continent Manufacturing Co., Inc. (Mid-Con). [1] These and other related corporations filed consolidated Federal income tax returns for the taxable years ending June 30, 1968, June 30, 1969, and for the taxable period ending October 29, 1969. On October 29, 1969, Mid-Con *267 was merged into Automatic Sprinkler Corporation of America which changed its name to A-T-O, Inc., and subsequently to Figgie International, Inc.Figgie International, Inc. (Figgie) is currently the named petitioner in this case. (Hereinafter all references to petitioner shall refer to Automatic Sprinkler Corporation of America, A-T-O, Inc., and Figgie, as appropriate.) Petitioner has conceded that it is liable for any of Mid-Con's Federal income tax deficiencies determined for the years in issue. The issues for decision are: (1) Whether the stock of Huber-Warco became worthless during the taxable year ended June 30, 1968, or at any time; (2) in the event that the Huber-Warco stock is not worthless, whether petitioner is entitled to deduct the fair market value of the Huber-Warco stock as an ordinary and necessary business expense under section 162; [2] and (3) whether petitioner is entitled to deduct certain obsolete inventory and to defer accrual of additional license income determined by respondent. *268 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner is an Ohio corporation with principal offices located in Willoughby, Ohio, at the time it filed its petition herein. Petitioner timely filed consolidated Federal income tax returns for the years in issue with the Internal Revenue Service Center, Cincinnati, Ohio. At all relevant times, Huber-Warco was a Brazilian corporation engaged in the manufacture and sale of road construction equipment and spare parts in Brazil. Prior to the years in issue, Huber-Warco was owned by Huber and its wholly owned subsidiary Huber-American. Huber's basis in its Huber-Warco stock was $649,115.19. On November 19, 1965, Huber purchased all of the Huber-Warco stock owned by Huber-American and become the sole shareholder of Huber-Warco. The parties agree that Huber's basis in the Huber-Warco stock purchased from Huber-American was $500,000. [3] For purposes of this case, Huber's total basis in the Huber-Warco stock throughout the years in issue was $1,149,115.19. *269 During March 1960 and January 1961, Huber loaned Huber-Warco $266,000 and $1,958,355, respectively, at 8 percent interest, payable on demand. Thereafter, Huber registered the two loan agreements with the Central Bank of Brazil. (Hereinafter, the two loan agreements will be referred to as the registered loans.) Registration of the loan agreements allowed Huber-Warco to remit principal and interest to Huber in U.S. dollars, a privilege otherwise prohibited by Brazilian currency restrictions. As of June 30, 1967, Huber-Warco had paid $235,511.43 of the total accrued interest and $11,755 of the principal due under the registered loans. On July 31, 1967, Huber-Warco owed a total of $3,054,927 in principal and accrued interest on the registered loans. [4]
From the onset of commercial production during 1960 through 1967, Huber-Warco was operated at a loss or at a marginal profit. [5] Huber-Warco's profitability suffered for a variety of reasons, including serious management [6] and production problems, but ultimately its profitability was dependent upon the amount of *270 Brazilian government spending for road construction. Huber-Warco's profit was extremely volume oriented, and a downward shift in government spending would seriously curtail sales, placing it in a loss position. To overcome its management and production problems, during 1965, Huber sent one of its employees, Glenn Burwell, to serve as general manager of Huber-Warco. Burwell was able to correct many of its management and production problems, but he only remained until 1966, when he was replaced by Richard Mozer. Mozer proved to be an excellent general manager. Under Mozer's control, Huber-Warco acquired a dominant share of the Brazilian motor grader market over its principal competitor, Caterpillar Tractor. *271 Prior to June 1967, Huber-Warco had not been able to repay the outstanding principal and accrued interest due on the registered loans in the ordinary course of business. Beginning in approximately June 1967, however, Huber-Warco's fortunes began to change. Huber-Warco recorded profits in eight of the nine months between June 30, 1967 and February 29, 1968, producing a total profit of $832,500 after payment of current interest due Huber on the registered loans. During this same period, Huber-Warco's net worth increased from a loss of ($388,126) to $354,764, and its net current assets increased from $210,946 to $1,059,931. Between June 1967 and February 1968, liquidation of Huber-Warco to repay the registered loans was not a feasible option for Huber. During this period, Huber-Warco did not have sufficient current assets to liquidate both its current liabilities and the principal and accrued interest on the registered loans. Moreover, liquidation would have had a substantial negative impact on Huber's trademarks and goodwill in the international market. [7]
*272 Beginning in 1965, Huber made a concernted and extensive effort to sell Huber-Warco. Over the course of the next two years, Huber unsuccessfully negotiated the proposed sale with several parties. Initially, Huber's asking price for its interest in Huber-Warco was approximately $4,000,000. Huber reduced the asking price to $2,500,000 by August 1967, and, to consummate the sale, Huber was also willing to forgive the amounts due under the registered loans. As part of every negotiation, Huber offered to execute a Technical Assistance Agreement in order to allow Huber-Warco continued use of Huber's trademarks, trade names, and technical know-how. Despite its substantial efforts between 1965 to 1967, Huber was unable to find any party willing to pay cash or other property for Huber-Warco. During August 1967, Mozer and Stroeter (hereinafter referred to as the Mozer group), notified Huber of its interest in acquiring the Huber-Warco stock. [8] The Mozer group offered to cause Huber-Warco to repay the principal and accrued interest on the registered loans within a specified period of time in exchange for the Huber-Warco stock. Although the Mozer group was aware that Huber-Warco historically *273 had not been able to generate sufficient cash to repay the principal and accrued interest on the registered loans, they believed that through a combination of increased Brazilian government spending, aggressive management, and possibly the disposition of as much as 49 percent of the stock to third parties, it could effect Huber-Warco's repayment of the registered loans. They also were aware that acquiring the stock in exchange for repayment of the registered loans would be beneficial to Huber-Warco because Huber-Warco could deduct the payments for Brazilian income tax purposes. Moreover, the Huber-Warco stock was registered with the Central Bank of Brazil in the amount of $1,413,716.20. Regislatration was a valuable right that permitted the stock owner to remit dividends or other returns on equity in U.S. dollars. *274 On September 1, 1967, Edward L. Smith sent Mozer a letter which reads in part: As discussed, we would be prepared to entertain an offer from your group pursuant to which you would purchase all of the assets of Huber-Warco and assume all of its liabilities of every nature and description, except the liability of Huber-Warco on its registered notes payable to Huber together with accrued interest thereon. The purchase price would be an amount equal to the unpaid principal balance on said registered notes together with all accrued and unpaid interest thereon. The purchase price will be payable in cash in United States Dollars at such place in the United States as would be mutually agreed upon. The sale would be subject to our entering into a satisfactory licensing agreement, embodying the right in you to sublicense, relating to your continued manufacture and sale of patented Huber products, the use of Huber trademark and trade names, and the rendering of technical assistance to Huber-Warco. [9]
The Mozer group was unwilling or unable to pay cash for the Huber-Warco *275 assets. Therefore they offered to cause Huber-Warco to repay the registered loans in exchange for the Huber-Warco stock on the following terms: (a) To commence immediately remitting all accrued interest (approximately $850,000); (b) to pay one-half the outstanding principal in cash within 180 days; and (c) to repay the remaining balance of the loans within three years at 7-1/2 percent interest. Between September 30, 1967 and December 31, 1967, Huber-Warco repaid $577,234.99 [10] in accrued interest on the registered loans. In a letter dated January 11, 1968, Smith agreed to sell Huber-Warco to the Mozer group on the following conditions: (a) Remittance of the remaining past due interest in the amount of $367,859.46 by March 1, 1968; (b) current monthly remittance of interest accruing on the outstanding balance of the registered loans; (c) execution of a Transfer Agreement by March 31, 1968; (d) execution of an Escrow Agreement requiring the Mozer group to deposit $100,000 earnest money and Huber to deposit all of its shares of the Huber-Warco stock; (e) repayment *276 of the $2,212,614.48 outstanding principal on the registered loans either (1) in its entirety on or before September 30, 1968, or (2) one-half of the principal on or before September 30, 1968, and the remainder (with 8 percent interest from that date) payable on or before June 30, 1969; (f) the purchase would not be considered final until a Licensee, Royalty, and Technical Assistance Agreement (the Technical Assistance Agreement) had been executed; and (g) the purchase would not be considered final until the outstanding principal of the registered loans was repaid in full. The parties agreed to carry out the sale in accordance with Smith's January 11, 1968, letter, although the express terms of the agreement were more specifically provided in a Transfer Agreement executed on March 10, 1968. Between January and March 31, 1968, Huber-Warco repaid Huber $494,236.30 in accrued and current interest; [11] Huber readied the Huber-Warco stock for transfer without registration pursuant to Brazilian law; Mozer borrowed the $100,000 earnest money; [12] and Mozer and Stroeter formed Cia de Fomento E Ingenieria Interamericana, S.A. (CIFISA), a Panamanian corporation, to enter into the Transfer *277 Agreement and other related documents with Huber. [13]
On March 10, 1968, CIFISA and Huber executed the Transfer Agreement and related documents. Pursuant to the Transfer Agreement, Huber-Warco was required to pay at least half the principal due on the registered loans by September 30, 1968, and the remaining principal and interest no later than June 30, 1969. Huber agreed to transfer legal title *278 to 51 percent of the Huber-Warco stock when half the principal had been paid and the remainder when the outstanding principal and interest were paid in full. All of the Huber-Warco stock remained in escrow until the principal and interest had been paid in full. As part of the Transfer Agreement, Mozer "agree[d] to cause to be made available to Huber-Warco funds in an amount sufficient to enable Huber-Warco to make the principal and interest payments on the [registered loans]." As a condition precedent to the release of the Huber-Warco stock from escrow, CIFISA was required to register the Technical Assistance Agreement with the Central Bank of Brazil. Registration permitted Huber-Warco to remit to Huber royalties due under the Technical Assistance Agreement in U.S. dollars, and to deduct such royalties for Brazilian tax purposes. Registration was commenced during October 1968, and the Central Bank issued a certificate of registration during December 1968. The legal fees incurred in the registration process did not exceed $2,000. During 1968, Stroeter, on behalf of CIFISA, sought to borrow sufficient money from Clark Equipment Company to refinance the registered loans. [14] *279 Clark Equipment refused to loan Huber-Warco any money based on its analysis of Huber-Warco's financial condition at that time. Thereafter, Huber-Warco ceased looking for third party funds due to Mozer's firm conviction that Huber-Warco's operations could generate sufficient income to repay the registered loans. In fact, Huber-Warco repaid the registered loans in full prior to February 14, 1969, without using third party funds. On February 14, 1969, CIFISA became the 100 percent shareholder of Huber-Warco. Huber-Warco was able to generate the income and cash flow necessary to repay the registered loans through a combination of Mozer's management skill and a significant upswing in the Brazilian economy during 1968 and 1969. Mozer adopted an aggressive management approach to generate the additional cash necessary to repay the registered loans. Among other things, he offered four key members of Huber-Warco's management an equity interest in Huber-Warco if they assisted CIFISA in causing repayment of the registered loans. [15] In addition, he dramatically increased Huber-Warco's *280 production and sales, and nearly doubled the percentage of trade accounts receivable that were discounted for cash in order to raise additional funds. Furthermore, he personally guaranteed some of the discounted accounts receivable. Between October 1, 1968 and September 30, 1973, Huber-Warco paid Huber Royalty fees totaling $1,522,849.82 under the Technical Assistance Agreement. The Technical Assistance Agreement expired in September 1973 because the Brazilian government refused to register a renewal. On July 30, 1975, Mozer, Stroeter, and the four management shareholders of Huber-Warco sold their entire interest in Huber-Warco to a third party for $10,624,339.25. For its taxable year ended June 30, 1968, petitioner claimed a $1,485,057.18 [16] worthless stock loss with respect to its disposition of the Huber-Warco stock. In a notice of deficiency dated June 22, 1979, respondent disallowed petitioner's claimed worthless stock loss. In addition, respondent determined *281 that petitioner should have accrued additional license income in the amounts of $2,615.86 and $26,993.52 during its taxable years ended June 30, 1968 and June 30, 1969, respectively. For petitioner's short taxable year ended October 2; 1969, respondent decreased petitioner's accrued license income by $15,204.92, and disallowed $35,820.47 of a claimed inventory obsolescence deduction. OPINION The issues for decision are (1) whether the Huber-Warco stock became worthless during the taxable year ending June 30, 1968; (2) if the Huber-Warco stock did not become worthless, whether petitioner is entitled to deduct the fair market value of the stock as an ordinary and necessary business expense; and (3) whether petitioner is entitled to deduct certain obsolete inventory and to defer accrual of additional license income determined by respondent. Issues 1 and 2
We will first determine whether the stock of Huber-Warco became wholly worthless *282 during the fiscal year ending June 30, 1968, entitling petitioner to a worthless stock deduction pursuant to section 165(g). Generally, section 165(g)(1) provides that if a "security" becomes worthless during the taxable year, the resulting loss shall be treated as a loss from the sale or exchange of a capital asset. Sec. 165(g)(1). Section 165(g)(3) provides, however, that: For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset. Section 1.165-5(d)(1), Income Tax Regs., further provides as follows: If a taxpayer which is a domestic corporation owns any security of a domestic or foreign corporation which is affiliated with the taxpayer within the meaning of subparagraph (2) of this paragraph and such security becomes wholly worthless during the taxable year, the loss resulting therefrom may be deducted under section 165(a) as an ordinary loss in accordance with paragraph (b) of this section. [Emphasis added.] It is undisputed that Huber's stock ownership in Huber-Warco was a security of an affiliated corporation and that, if the stock of Huber-Warco became *283 wholly worthless during 1968, Huber is entitled to an ordinary loss deduction to the extent of its basis. A finding that the stock was worthless cannot be based only upon the taxpayer's belief and actions; all pertinent facts and circumstances, objective and subjective, must be considered. Boehm v. Commissioner,326 U.S. 287, 292 (1945). Respondent's determination as set forth in the statutory notice of deficiency is presumptively correct and the taxpayer has the burden of establishing that the stock became worthless during the taxable year by a preponderance of the evidence. Royal Packing Co. v. Commissioner,22 F.2d 536 (9th Cir. 1930), affg. 13 B.T.A. 773 (1928). Rule 142(a), Tax Court Rules of Practice and Procedure.
The test used to determine the worthlessness of stock was accurately stated in Morton v. Commissioner,38 B.T.A. 1270, 1278, 1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940), as follows: The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations *284 of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has potential value and can not be said to be worthless. The loss of potential value, if that exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. Petitioner argues that Huber is entitled to a worthless stock loss with respect to its disposition of the Huber-Warco stock because, pursuant to the Transfer Agreement, no cash consideration was received for the stock; thus, the stock must be regarded as "worthless in a practical sense." We disagree. On the record before us, we do not believe that the stock became worthless any time during 1968. Although the record is inconsistent on the value of the stock, [17] it clearly shows that the Huber-Warco stock had potential value. *285 [18] Beginning in June 1967, Huber-Warco's fortunes began to change. Huber-Warco recorded a profit after payment of current interest on the registered loans during the nine-month period from June 1967 to February 29, 1968. During this same period, Huber-Warco's net worth increased from a loss of ($388,126) to $354,764 and its net current assets increased from $210,946 to $1,059,931. The evidence establishes that by March 10, 1968, the date the Transfer Agreement was executed, Huber-Warco's future looked promising. Moreover, Mozer, Huber-Warco's general manager, firmly believed that Huber-Warco would be profitable in the future. Through aggressive management, increased Brazilian government spending, and possible disposition of as much as 49 percent of the stock to third parties, Mozer was confident that Huber-Warco could repay all outstanding principal and interest on the registered loans on or before June 30, 1969. In fact, the registered loans were paid in full prior to February 14, 1969, without having to sell any stock or borrow money from third parties. *286 In addition, Huber negotiated the sale with tax consequences in mind. Huber's decision to accept no money for the stock can not be taken as evidence that the stock was worthless on the date of the transfer. In exchange for the Huber-Warco stock, Huber received other valuable consideration. Under the terms of the Transfer Agreement, CIFISA promised to cause Huber-Warco to repay in full all outstanding principal and interest on the registered loans by a specified date, to execute a Technical Assistance Agreement and a License Agreement, and to register the Technical Assistance Agreement with the Central Bank of Brazil. In exchange for these promises, Huber agreed to transfer 51 percent of the Huber-Warco stock to CIFISA when half of the principal on the registered loans had been paid. Huber's remaining Huber-Warco stock would be transferred to CIFISA when all outstanding principal and interest on the registered loan was paid in full. [19] CIFISA intended to, and did in fact, pay off the loans entirely out of income generated by Huber-Warco. *287 After careful review of the record before us, we find that the Huber-Warco stock certainly had, at least, potential value on the date it was transferred to CIFISA. Accordingly, petitioner's claimed worthless stock loss must be denied. We will now discuss petitioner's alternative argument that it is entitled to deduct the fair market value of the Huber-Warco stock as ordinary and necessary business expense. Petitioner argues that pursuant to the Transfer Agreement, Huber received substantial "services" from CIFISA in exchange for the Huber-Warco stock, and that these services constituted an ordinary and necessary business expense to Huber under section 162. Thus, petitioner concludes that Huber is entitled to deduct the fair market value of its Huber-Warco stock as an ordinary and necessary business expense. In essence, petitioner's position is that the transfer of the Huber-Warco stock was the quidproquo for CIFISA's services. After the transfer, Huber would recognize capital gain or loss, as well as a deduction equal to the fair market value of the stock under section 162 as payment for services rendered. [20] Petitioner asserts that the Huber-Warco stock had *288 a fair market value of $3,000,000 and, therefore, Huber must recognized long-term capital gain in the amount of $1,850,884,81, [21] and an ordinary and necessary business expense in the amount of $3,000,000. We reject petitioner's argument for two reasons: first, the fair market value of the Huber-Warco stock on the date of the transfer was de minimis; second, we agree with respondent that the transfer of stock to CIFISA constituted a sale, and that any services performed by CIFISA were incidental to sale and not deductible under section 162. We will discuss each reason more fully below. The parties have stipulated that on the date the Transfer Agreement was executed, the Huber-Warco stock had a fair market value of $3,000,000.[22] Under normal circumstances, we hold that the parties are bound by the stipulation of facts. The Court will not lightly disregard a fact agreed to by both parties in the stipulation. Jasionowski v. Commissioner,66 T.C. 312, 318 (1976). *289 However, in unusual circumstances, such as those here present, when a stipulated fact is clearly contrary to the record presented to us at trial, the Court will not be bound by the stipulation. Meads Bakery, Inc. v. Commissioner,364 F.2d 101 (5th Cir. 1966), affg. a Memorandum Opinion of this Court; Jasionowski v. Commissioner,supra at 318; T.K. Harris Co. v. Commissioner,38 B.T.A. 383, 386 (1938); Dana v. Commissioner,36 B.T.A. 231, 237 (1937); Seatree v. Commissioner,25 B.T.A. 396, 401 (1932). For the reasons more fully set forth below, we find that the parties' stipulation as to the value of the Huber-Warco stock contrary to the clear weight of the evidence and, accordingly, it must be disregarded. Between 1965 and 1967, Huber made a comprehensive effort to sell *290 Huber-Warco. In so doing, Huber was willing to forgive in excess of $3,000,000 in outstanding principal and interest on the registered loans. Even with the discharge of this debt, Huber lowered its asking price from $4,000,000 to $2,500,000. Despite its substantial efforts, Huber was unable to locate a purchaser willing to pay cash for the Huber-Warco stock even without the debt to Huber. In August 1967, the Mozer group notified Huber of its desire to purchase the stock for the promise to repay all outstanding principal and interest on the registered loans within a specified period of time. Huber, skeptical of the Mozer group's ability to repay the loans, counter offered to sell the Huber-Warco stock for an amount equal to the outstanding principal and interest on the registered loans, and those loans would be forgiven. In other words, Huber wanted the cash up front. However, the Mozer group was unwilling or unable to pay cash for the stock and, on January 11, 1968, Huber agreed to consummate the sale in accordance with the Mozer group's initial proposal. The evidence suggests that a ready, willing, and able purchaser would either purchase the Huber-Warco stock for an amount *291 approximating the outstanding principal and interest on the registered loans if the loans were forgiven, or would have purchased the stock for nominal consideration and repay the loans in full. [23] Consequently, we believe that the only possible way the Huber-Warco stock could have a fair market value of approximately $3,000,000 was if the registered loans were forgiven. The fact remains, however, that the registered loans were never discharged. Therefore, we must conclude that the fair market value of the Huber-Warco stock, on the date of the transfer, was de minimis. Accordingly, Huber is entitled to a capital loss up to its basis in the Huber-Warco stock and no deduction under section 162. Moreover, even were we to assume that the Huber-Warco stock had a fair market value on the date of its *292 transfer, we agree with respondent that any "services" performed by CIFISA were incidental to the sale and not deductible under section 162. Petitioner argues that the Huber-Warco stock was exchanged for services. We disagree. As we view the transaction, it constituted a sale. Huber's primary motive for transferring the stock was to dispose of Huber-Warco. Indeed, in a letter dated September 1, 1967, to Mozer, Edward L. Smith, Chairman of Huber, referred to the proposed transaction as a "sale." Any services rendered were incidental to the sale and, if performed for Huber, would increase the amount realized. See International Freighting Corp. v. Commissioner,45 B.T.A. 716 (1941), affd. 135 F.2d 310 (2d Cir. 1943). In support of his position, petitioner cites Santa Anita Consolidated, Inc. v. Commissioner,50 T.C. 536 (1968), and International Freighting Corp. v. Commissioner,supra. We find both cases distinguishable from the present case. Santa Anita involved a unique situation wherein the taxpayer transferred a subsidiary's stock and cash to an unrelated corporation in order to obtain a release of *293 liability as a guarantor. We held that the taxpayer incurred an ordinary loss for the cash paid as well as a capital loss for its basis in the subsidiary's stock. In the present case, Huber did not remit any money to CIFISA for the transfer of its Huber-Warco stock. Moreover, in Santa Anita the taxpayer argued it suffered a loss under section 165 while, in the instant case, petitioner argues that Huber incurred an ordinary and necessary business expense under section 162. [24] Accordingly, we find Santa Anita is not apposite to the facts before us. International Freighting Corp., involved the situation where the taxpayer paid its employees bonuses consisting of appreciated stock in another corporation. We held, and the Second Circuit affirmed, that the transaction should be treated as a sale or exchange of the stock for consideration equal to its fair market value followed by the payment of compensation equal to the fair market value of the stock. Consequently, taxpayer recognized capital gain as well as a business expense deduction under section 162. In the instant case, unlike in International *294 Freighting Corp., it is clear that petitioner did not exchange the stock for the services. The only "services" performed by CIFISA under the Transfer Agreement were (1) to cause Huber-Warco to repay the loans, and (2) execution and registration of the Technical Assistance Agreement. These services were, at best, incidental to Huber's disposition of the stock which was its primary goal. When the transaction is viewed as a whole, its capital nature becomes apparent. Petitioner may not, simply by pointing to a service which was incident to the sale, transform the transaction into an ordinary and necessary business expense. On brief, petitioner asserts that "the primary undertaking of CIFISA was to cause Huber-Warco to repay the principal and accrued unterest on the registered loans." However, the transaction at issue was a contingent sales contract, not a contingent service contract. While CIFISA's primary undertaking may have been to cause Huber-Warco to repay the loans, causing Huber-Warco to repay the loans was the only way CIFISA could obtain the stock. Petitioner also points to the many efforts that Mozer went through to repay the registered loans as bargained for services. *295 In our view, however, Mozer's aggressive management decisions, designed to enable Huber-Warco to repay the registered loans, were not services performed for Huber. Any of the so-called services that Mozer performed were no more than any other entrepreneurial individual would perform to ensure that he received the stock that he considered to be extremely valuable. The financial and business risks that Mozer assumed "are not typically assumed by mere employees or salesmen who have no ownership interest in the business." Foy v. Commissioner,84 T.C. 50, 71 (1985). Therefore, we find that Mozer's actions are not derived from an obligation to perform services for Huber, but were to obtain ownership of Huber-Warco. On brief, petitioner further contends that, pursuant to the Transfer Agreement, Huber transferred the Huber-Warco stock to obtain the Following additional services: (1) Mozer's personal guarantee of the registered loans; and (2) CIFISA's promise to continue operating Huber-Warco; and (3) CIFISA's obligation to register the Technical Assistance Agreement with the Central Bank of Brazil. We believe Mozer's guarantee was of little value to Huber because Mozer *296 personally did not have sufficient money to repay the registered loans. [25] In addition, by March 1968, Huber-Warco's cash flow and net worth had dramatically increased and that, in addition to the resurgence of the Brazilian economy, made the risk that Huber-Warco could not pay the registered loans quite low. More significantly, we believe that Mozer's consent to guarantee the loan reflects Mozer's strong desire to become the owner of Huber-Warco. While Huber may have believed the Huber-Warco stock to have little potential value, Mozer obviously believed the stock was worth a great deal. His willingness to borrow $100,000 for a fee of $1,000,000 if he were successful in obtaining the stock clearly indicates that Mozer believed he was obtaining a very valuable commodity. The subsequent sale of Huber-Warco in 1975 for approximately $10,000,000 proves that Mozer was correct. Petitioner next argues that Mozer and CIFISA agreed to continue operating Huber-Warco and thereby preserved the value of Huber's existing trademarks, trade names, *297 and goodwill in the international market. However, there is no evidence that CIFISA or Mozer expressly agreed to continue operating Huber-Warco for any period of time. The Transfer Agreement and related documents only imply that Mozer and CIFISA would continue Huber-Warco's operations in order to generate the income to repay the loans. [26] Once the loans were repaid, CIFISA was free to liquidate Huber-Warco. [27]
Petitioner also asserts that it transferred the Huber-Warco stock to CIFISA in exchange for the latter's obligation *298 to register the Technical Assistance Agreement with the Central Bank of Brazil. The cost of registering the Technical Assistance Agreement was approximately $2,000. Registration of the Technical Assistance Agreement was important to each of the parties. It can not be considered to have been a service performed for Huber and we do not believe it was considered a significant factor in causing the stock transfer. Accordingly, any services performed by CIFISA were incidental to the disposition of the stock, and not deductible as an ordinary and necessary business expense. Issue 3
The third issue for decision is whether petitioner is entitled to deduct certain obsolete inventory and to defer accrual of additional license income. Neither party has presented any evidence on this issue, and each contends that the other bears the burden of proof. In the statutory notice of deficiency, respondent, in his Explanation of Adjustments, refers to petitioner as the person who engaged in the transaction at issue. Pursuant to a Memorandum Sur Order attached to this Court's order dated August 26, 1982, we held that the notice of deficiency sent to petitioner shall be treated as a notice *299 of transferee liability, and respondent was granted leave to amend his answer to allege a basis for transferee liability. Respondent amended his answer to allege facts supporting transferee liability, but did not amend any of the substantive factual bases set forth in the Explanation of Adjustments to the notice of deficiency which supported the determined deficiencies. On October 26, 1982, this Court ordered respondent to amend his answer to correct the numerous references to petitioner as the person who engaged in the transactions referred to in the Explanation of Adjustments. In his second amended answer, respondent alleged that Mid-Con rather than petitioner improperly claimed an obsolete inventory deduction and failed to report certain accrued license income in computing its taxable income. Petitioner argues that these allegations constituted the pleading of a "new matter" for purposes of Tax Court Rule 142(a) because the new allegations require proof of Mid-Con's or Huber's activities, rather than petitioner's (A-T-O's or Figgie's) activities, necessitating "the presentation of different evidence." We find it incredible that petitioner maintains that respondent's technical *300 correction of references to its instead of Huber or Mid-Con can constitute a "new matter" warranting the placing of the burden of proof on respondent. An examination of petitioner's petition, filed with this Court on August 30, 1979, reveals that petitioner was well aware that it was Huber's or Mid-Con's activities that were in dispute. Thus, petitioner can hardly claim that it was "surprised" or "disadvantaged" by respondent's second amended answer that merely clarified his original determinations. See Achiro v. Commissioner,77 T.C. 881, 890 (1981). In an order dated January 7, 1983, we held in accordance with section 6902(a) that "the burden of proof is on respondent to show that petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax." Moreover, petitioner has conceded that it is liable for any of Mid-Con's Federal income tax deficiencies. We believe that the Court's January 7, 1983, order correctly placed the burden of proof on petitioner to show that it is not liable for income tax deficiencies determined by respondent. Accordingly, since petitioner has presented no evidence, we hold for *301 respondent on this issue. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. This corporate structure is the net result of several transactions which are not relevant to the issues herein.↩
2. All section references are to the Internal Revenue Code of 1954, as amended.↩
3. The parties reached the $500,000 valuation by different methods, but since the parties agree on the basis figure it is unnecessary for us to determine the proper method of valuation.↩
4. The outstanding principal on the two registered loans was $2,212,615 as of June 30, 1967 and July 31, 1967.↩
5. The following chart shows the net profit or (loss) in U.S. dollars for Huber-Warco for its fiscal and taxable periods through June 30, 1967: Year Ended
Profit/Loss
Oct. 31, 1961 * ($1,040,444)
Oct. 31, 1962
(279,443)
Oct. 31, 1963
(348,918)
Oct. 31, 1964
(658,393)
Oct. 31, 1965
281,992 Oct. 31, 1966
233,627 June 30, 1967 **
(353,710)
* This amount represents Huber-Warco's accumulated deficit as of October 31, 1961. ** This unaudited financial statement covers the eight months ended June 30, 1967. ↩
6. Because of suspected mismanagement, Huber-Warco's management was removed during 1961, by Dr. Carlos E. Stroeter, a partner in the Brazilian law firm of Storeter, Trench & Vierano and in the Illinois law firm of Baker and McKenzie. Thereafter, Dr. Stroeter became a director of Huber-Warco, which position he held until 1975.↩
7. Approximately 30 percent of Huber's sales occurred outside the United States, and Huber had License Agreements with licensee-manufacturers in six foreign countries. Brazil was the only market in the world in which Huber's motor graders outsold Caterpillar products.↩
8. In August 1967, Stroeter disclosed fully to Edward L. Smith, Chairman of Huber, his participation in the Mozer group. During the course of the negotiations between the Mozer group and Huber, Huber was represented by George Massar, a partner in a Columbus, Ohio, law firm which was not affiliated in any way with the law firms of Baker & McKenzie or Stroeter, Trench & Vierano.↩
9. Huber wished to structure the transaction as an asset sale in order to obtain a worthless stock loss deduction.↩
10. Of the total amount received, $131,425.43 was not recognized by Huber for financial accounting purposes until 1968.↩
11. Huber-Warco's payment of accrued and current interest between September 1967 and March 1968, tended to prove that the Mozer group could succeed in causing Huber-Warco to repay the registered loans in full. Accordingly, Huber ceased looking for a third party to purchase Huber-Warco after negotiations with a potential purchaser concluded unsuccessfully in the late summer of 1967. ↩
12. The $100,000 was borrowed from a Panamanian corporation unrelated to any of the parties herein. Pursuant to Mozer's agreement, the Panamanian corporation was to receive a $1,000,000 fee in the event the Mozer group was successful in acquiring the Huber-Warco stock. ↩
13. Mozer and Stroeter served as officers and directors of CIFISA. Mozer owned 70 percent and Stroeter 30 percent of CIFISA's stock.↩
14. Stroeter offered Clark Equipment up to 49 percent of the Huber-Warco stock in consideration of the loan.↩
15. As a result of the successful acquisition of the Huber-Warco stock, CIFISA distributed approximately 25 percent of a newly created class of Huber-Warco preferred stock to Huber-Warco's four top managers.↩
16. On its return for the period ended June 30, 1964, petitioner claimed that its basis in the Huber-Warco stock was $1,485,057.18. For purposes of this case, we have found that petitioner's basis in the Huber-Warco stock was $1,149,115.19.↩
17. See our discussion at pages 20-22, infra.↩
18. We do not have to determine the fair market value of the Huber-Warco stock in order to find that it was not worthless; to hold that the stock was not worthless, we need only find that the stock had some potential value. Morton v. Commissioner,38 B.T.A. 1270, 1278-1279 (1938), affd. 112 F.2d 320↩ (7th Cir. 1940).
19. Huber and CIFISA were dealing at arm's length. CIFISA was either unwilling or unable to pay cash for the Huber-Warco stock.Indeed, CIFISA had to borrow $100,000 that was required to be deposited into an escrow account under the Transfer Agreement.↩
20. It is as if Huber sold the Huber-Warco stock for cash and paid CIFISA for the services. ↩
21. This represents the excess of the fair market value of the Huber-Warco stock, $3,000,000, over Huber's basis in the stock $1,149,115.19.↩
22. Petitioner apparently agreed to the stipulation because it supports its alternative argument that the stock was exchanged for services. Respondent, assuming that the Court would reject petitioner's alternative argument, apparently agreed to the stipulation because it discredited petitioner's worthless stock argument.↩
23. If the loans were discharged, Huber would have been unable to claim a bad debt loss. Huber would have been solvent at the time, and normally, no bad debt deduction may be claimed when the debtor is solvent at the time the debt is discharged. See Ames v. Commissioner,1 B.T.A. 63 (1924); see also Davies v. Commissioner,54 T.C. 170, 176↩ (1970).
24. Respondent concedes that Huber is entitled to a capital loss.↩
25. At trial, Stroeter testified that the Mozer group sought to structure the transaction as they did because they did not have any money.↩
26. The documents related to the negotiations leading up to the March 10, 1968, agreement show that Huber insisted on execution of the Technical Assistance Agreement, but nowhere did it mention CIFISA's obligation to continue Huber-Warco's operations. ↩
27. Moreover, any implicit obligation to continue Huber-Warco's operations would have lasted no more than the 15 months between the March 10, 1968 agreement and the June 30, 1969, deadline for repayment of the loans. This short a period for continued operation of Huber-Warco is unlikely to have preserved Huber's trademarks, trade names, and goodwill in the international market to any significant extent.↩