T.C. Memo. 2000-92


UNITED STATES TAX COURT


HERMINE LEVENTHAL, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

HARVEY R. LEVENTHAL, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 24439-95, 26613-95.        Filed March 20, 2000.


Guy B. Maxfield, for petitioner in docket No. 24439-95.

Stuart A. Smith, for petitioner in docket No. 26613-95.

Anthony H. Jones, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  By separate notices of deficiency, respondent determined the following deficiencies, addition to tax, and penalty with respect to petitioners' Federal income taxes:

Hermine Leventhal

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|---|---|---|---|
| 1990 | $17,957 | $4,434 | $3,591 |
| 1991 | 17,065 | -- | -- |

Harvey R. Leventhal

| Year | Deficiency |
|---|---|
| 1990 | $18,928 |
| 1991 | 14,345 |

These cases were consolidated for trial, briefing, and opinion. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

After concessions,[1] the issue for decision is whether certain payments made by petitioner Harvey Leventhal (Harvey) constitute alimony or separate maintenance payments, includable in the gross income of petitioner Hermine Leventhal (Hermine) under section 71(a) and deductible by Harvey under section 215(a). Respondent issued inconsistent notices of deficiency to Harvey and Hermine, determining that Harvey was not entitled to deduct and Hermine was not entitled to exclude from gross income the disputed payments. At trial and on brief, respondent argues

---

[1] Respondent concedes that petitioner Hermine Leventhal is not liable for the addition to tax under sec. 6651(a)(1) or the penalty under sec. 6662(a).

in support of Hermine's position, while reserving his rights to assess deficiencies against her.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Hermine resided in New York, New York, and Harvey had a legal address in Staten Island, New York, at the time their petitions were filed.

Hermine and Harvey were married on July 5, 1954. In or around December 1987, petitioners separated due to marital difficulties. At this time, Hermine moved out of the house they had shared on Emerson Drive, Staten Island, New York (marital home), and stayed with various friends from December 1987 until June or July 1988. At some point in 1988, Hermine commenced an action for divorce in the Supreme Court of the State of New York. Hermine engaged an attorney, Charles Moser, to handle the divorce proceedings and property settlement and to negotiate a place for her to live in the interim. Harvey engaged an attorney, Irvin Rosenthal, to handle the divorce proceedings and property settlement as well as any interim matters.

On April 1, 1988, Mr. Rosenthal sent a letter to Mr. Moser (April 1 letter). Clearly marked as "PRIVILEGED AND CONFIDENTIAL AND WITHOUT PREJUDICE", the letter states:

Dear Mr. Moser:

This is in reply to your letter of March 21, 1988.[2]

1.  Occupancy of Marital Home.

Dr. Leventhal is amenable to alternate sharing of the marital home on an equal time-share basis with three months alternatively to the wife and husband.  The foregoing is contingent on the wife agreeing to presently placing the marital home on the market for sale at the highest obtainable market price, with the net proceeds of sale to be held in escrow, until a final judgment of the Court in the divorce action, or agreement with the parties.

The husband will pay all normal and usual expenses of maintenance and operation of the marital home and the alternate residence the occupancy of both of which are to be shared by the parties.  Our clients shall agree with respect to the alternate residence.

Accordingly, no appraisal will be required since the home will presumably be sold before the conclusion of the action.

2.  Tangible Personal Property.

With regard to the tangible personalty of value, viz., antiques, our client Dr. Leventhal is agreeable to having the parties select the items on an alternate selection basis, with the first selection to the wife.  This again will obviate the necessity for an appraisal of the personalty.

3.  Professional Corporation's Payment.

In view of the fact that Mrs. Leventhal is no longer on the payroll of the professional corporation, no further payments of $154 bi-weekly can be, nor will they, be made to Mrs. Leventhal.

---

[2]  The referenced Mar. 21, 1988, letter is not a part of the record in this case.

4.    Counsel Fee.

Our client and we both feel that no counsel fee payment by the husband is indicated in this action since your client Mrs. Hermine Leventhal has assets in her own name and control in excess of $1,700,000 of which at least $374,000 is in liquid funds in the form of bank funds and marketable securities, exclusive of real property.

Mrs. Leventhal can well afford to advance her own counsel and expert fees.  Our client did agree without prejudice, to advance $2,500 toward your client's expert fees and same is enclosed under separate cover.

5.    Matrimonial Support.

Mrs. Leventhal has available to her $450 per week from a joint account regularly and periodically funded by her husband and an additional $200 per week paid to her by her husband from funds of a joint account.  The wife pays $120 a week for a maid from the aforesaid sums, and the husband has in the past and continues to pay all other expenses in connection with the operation and maintenance of the home, and further pays all charge accounts.

6.    Review of Professional Corporation.

As I advised you on the phone on March 31st, and as my partner Rona Shays previously wrote to you, if you will send us a list of the books and records of the professional corporation you wish to have examined by your accountants, the years involved, and the names of your accountants, we will arrange to have the professional corporation arrange a mutually satisfactory appointment for your experts to review same.  Obviously, there will be excluded from your inspection any records pertaining to patients, so as not to breach patient confidentiality afforded them by law.

    7.    <u>Venue</u>.

        Our position regarding venue is clearly and succinctly set forth in our motion papers.  It is our intention to timely pursue our motion.

                        Very truly yours,

                        Irvin H. Rosenthal

On June 1, 1988, Mr. Moser sent a letter to Mr. Rosenthal

stating:

Dear Mr. Rosenthal:

With reference to your telephone conversation with my offices yesterday, our prior communications and phone conversations and with specific reference to the Lease from SILVER LAKE ASSOCIATES (Owner) to our Clients (Tenants), it is understood and agreed as follows:

    (1) our clients will alternate, on a two (2) month each basis, both apartment 5N on the fifth floor of 961 Victory Boulevard, and the marital home located at 2 Emerson Drive, both Staten Island, New York; Harvey Leventhal to occupy the home for the months of June and July 1988, (Hermine Leventhal to occupy the apartment during that period) and Hermine Leventhal to occupy the home for the months of August and September 1988 (Harvey Leventhal to occupy the apartment during that period) and thereafter they shall similarly alternate the occupancy of both premises.

    (2) Harvey Leventhal will pay all normal and usual expenses of maintenance and operation of the marital home and the alternate residence, the occupancy of which are to be shared by the parties as aforesaid.

Of course, as we discussed on the phone earlier today, all of the foregoing is based upon SILVER LAKE ASSOCIATES (Owner) accepting the changes you made in the Lease previously forwarded.

Kindly acknowledge the acceptance of the above conditions by signing and returning to me, via my messenger, the enclosed copy of the instant communication together with both copies of the Lease.

Very truly yours,

CHARLES E. MOSER

CEM:tp
Encl.
UNDERSTOOD, ACCEPTED AND AGREED:_____

ROSENTHAL & SHAYS, by:
IRVIN H. ROSENTHAL,ESQ.
Attorneys for Defendant
HARVEY LEVENTHAL

The letter was signed by Mr. Moser and countersigned by Mr. Rosenthal on behalf of Harvey.

Later that day, Mr. Moser sent a second letter to Mr. Rosenthal stating:

Dear Mr. Rosenthal:

Enclosed herewith is a signed copy of the communication hand delivered to your offices earlier today.

This communication will further confirm the agreement of the parties and our understanding regarding the alternating occupancy of the marital home and Apartment 5N at 961 Victory Boulevard, Staten Island, New York, on a two (2) month basis, assuming that the changes made in the Apartment Lease are accepted by SILVER LAKE ASSOCIATES (Owner-Lessor), as follows:

(1) the marital home located at 2 Emerson Drive, Staten Island, New York, will be forthwith placed on the market and listed for sale at the highest fair market price with a Licensed Real Estate Broker a member of the local Multiple Listing Service; that such a listing will not preclude a private sale at no less than the listing price; and that we will hold the net proceeds of the sale in escrow, the same to be released and distributed pursuant to the Judgment of Divorce to be entered herein or the mutual agreement, in writing, of the parties.

In the haste of the hand delivery of my earlier communication the instant "listing and sale" provision was omitted.

Kindly acknowledge the acceptance of the above by signing and returning to me, in the envelope provided, the enclosed copy of this letter.

                              Very truly yours,

                              CHARLES E. MOSER

CEM:tp

UNDERSTOOD, ACCEPTED AND AGREED:_____
                              ROSENTHAL & SHAYS, By:
                              IRVIN H. ROSENTHAL,ESQ.
                              Attorneys for Defendant

Again, this letter was signed by Mr. Moser and countersigned by Mr. Rosenthal on behalf of Harvey. These two letters set forth above dated June 1, 1988, are collectively referred to hereinafter as the "June 1 letters".

During 1990 and the first 6 months of 1991, petitioners alternately occupied the apartment on Victory Boulevard in Staten Island, New York (apartment), and the marital home on a 2-month rotation; i.e., each petitioner occupied one of the residences for 2 months, and then petitioners switched locations. Petitioners were designated as tenants on the lease for the apartment.[3] In June 1991, Harvey refused to renew the lease on the apartment, and from July 1, to December 31, 1991, petitioners shared occupancy of the marital home but did not live together as

---

[3] We reach this conclusion on the basis of the first June 1 letter, which makes specific reference to the "Lease from SILVER LAKE ASSOCIATES (Owner) to our Clients (Tenants)".

husband and wife. Title to the marital home was in Hermine's name during this 2-year period.

During 1990, Harvey made cash payments totaling $26,358.65 to Hermine directly. The parties have stipulated that Harvey also made payments "on Hermine's behalf" for that year, specifically described as follows:

```
  $891.30 as car payments
8,331.02 as mortgage payments on the marital home
6,720.64 as rent for the apartment
  812.75 for furniture rental
1,252.10 to Brooklyn Union Gas
1,829.00 to a gardener
3,521.02 to Con Edison for electricity
1,654.12 to Quinlan Oil
1,172.33 to Town & Country Pool
8,095.12 as insurance payments
  432.29 to New York Telephone
  230.74 as miscellaneous expenses (plumbing,
          electricity, water, etc.)
```

On his 1990 return, Harvey deducted as alimony $66,275.[4]

During 1991, Harvey made cash payments totaling $25,012.55 to Hermine directly. The parties have stipulated that Harvey also made payments "on Hermine's behalf" for that year, specifically described as follows:

---

[4] Although the total amount stipulated as paid in 1990 directly to or on Hermine's behalf equals $61,301.08, Harvey claimed an alimony deduction for that year of $66,275. The parties have offered no explanation for this discrepancy. However, because we conclude that Harvey is entitled to an alimony deduction for 1990 that is substantially less than $61,301.08, the discrepancy has no significance.

$3,623.49 as car payments
9,166.00 as mortgage payments on the marital home
3,398.55 as rent for the apartment
  419.19 to Brooklyn Union Gas
3,001.00 to a gardener
2,357.72 to Con Edison for electricity
2,983.12 to Quinlan Oil
  887.42 to Town & Country Pool
9,952.07 as insurance payments
  185.33 to New York Telephone
1,248.93 as miscellaneous expenses (plumbing,
             electricity, water, etc.)

On his 1991 return, Harvey deducted as alimony $62,999.[5]

During 1990 and 1991, with certain exceptions, Harvey sent weekly checks to Hermine. These checks were generally for $530, although they were frequently for lesser amounts, sometimes with an offset for some item such as utilities noted on the check and sometimes without explanation. Similarly, Harvey generally made out monthly checks to Hermine during this period on which "car payment" was noted.

Harvey did not make the $530 weekly payments unfailingly. On June 18, 1991, Hermine's counsel, Mr. Moser, sent a letter to Harvey's counsel, Mr. Rosenthal, as follows:

Dear Mr. Rosenthal:

    I am advised that your client [Harvey] has failed to remit his maintenance payments for the following

---

[5] As was the case for 1990, the amount deducted as alimony by Harvey for 1991 ($62,999) does not equal the amount stipulated as paid directly to or on behalf of Hermine ($62,235.37). The parties have also offered no explanation for this discrepancy, but it is likewise without significance because we conclude that Harvey is entitled to an alimony deduction for 1991 that is less than $62,235.37.

periods: May 31st; June 7th; and June 14, 1991, representing the total sum of $1,590.00 (@ $530.00).

In addition his check representing the car lease payment for the month of June, in the sum of $297.10, has also not been remitted.

The only payment made of late was his check, just received and without explanation whatsoever, dated June 7, 1991 and in the sum of $210.00.

*    *    *    *    *    *    *

* * * if the total monies due and owing my client are not received by her on or before June 20, 1991, I will, without further notice, seek judicial intervention and make a formal application to the court on June 24th. * * *

A second letter that month from Hermine's to Harvey's counsel similarly took the position that Harvey was in arrears with respect to his obligation to make maintenance and car payments. Finally, in February 1992, before petitioners' execution of a final settlement agreement, Hermine's counsel sent a letter to Harvey's counsel suggesting a need to verify maintenance payments for the last one-third of 1991.

During 1990 and 1991, Harvey paid $6,724 and $7,471, respectively, for homeowner's insurance on the marital home.  The policies listed Hermine as the named insured, and covered the dwelling as well as certain personal property therein, including fine art, jewelry, and furs.  The remaining amounts stipulated as for insurance covered life and other insurance.

There was no court decree of divorce or separate maintenance in effect during 1990 or 1991.  A settlement agreement providing

for the division of petitioners' marital property and settlement of all their respective obligations was executed by petitioners on February 27, 1992, and a final Judgment of Divorce was granted by the Supreme Court of the State of New York on March 6, 1992.

For both the 1990 and 1991 taxable years, petitioners each filed Federal income tax returns under the status of married filing separate return. As noted earlier, Harvey claimed a deduction for alimony payments of $66,275 in 1990 and $62,999 in 1991. Hermine did not include any amount as alimony in her gross income for those years.

Respondent issued inconsistent notices of deficiency to Harvey and Hermine, disallowing Harvey's alimony deductions and determining that Hermine must include in gross income for 1990 and 1991, $66,275 and $64,994,[6] respectively.

OPINION

"Alimony or separate maintenance payments", as defined in section 71(b), are includable in the gross income of the

---

[6] The alimony income determined for Hermine in 1990 matches the alimony deduction disallowed for Harvey in that year. However, for 1991 the amount of alimony income determined for Hermine exceeds the deduction disallowed for Harvey by $1,995. Furthermore, as with Harvey's deductions, the income attributed to Hermine in both years exceeds the amounts stipulated as received directly by or on behalf of Hermine. As we sustain respondent's determination with respect to Hermine's alimony income in amounts less than those stipulated as received by her in each year, these discrepancies are without significance.

recipient and deductible by an individual payor in the year paid. See secs. 71(a) and 215(a).

Section 71(b)(1) defines "alimony or separate maintenance payment" as:

any payment in cash if--

(A) such payment is received by (or on behalf of) a spouse under a divorce or separation instrument,

(B) the divorce or separation instrument does not designate such payment as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215,

(C) in the case of an individual legally separated from his spouse under a decree of divorce or of separate maintenance, the payee spouse and the payor spouse are not members of the same household at the time such payment is made, and

(D) there is no liability to make any such payment for any period after the death of the payee spouse and there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse.

The parties do not dispute that the requirements of section 71(b)(1)(B) and (C) are met in the instant case. The principal dispute concerns section 71(b)(1)(A); while Harvey contends that the amounts in dispute meet the requirements of section 71(b)(1)(A), Hermine and respondent argue that the amounts were not received by or on behalf of Hermine under a divorce or separation instrument. In addition, respondent argues that the amounts do not in any event qualify as alimony or separate maintenance payments because Harvey's liability for the payments

did not terminate upon Hermine's death, as required by section 71(b)(1)(D).

Were Payments Received Under a Divorce or Separation Instrument?

Under section 71(b)(2), the term "divorce or separation instrument" means:

> (A) a decree of divorce or separate maintenance or a written instrument incident to such a decree,
>
> (B) a written separation agreement, or
>
> (C) a decree (not described in subparagraph (A)) requiring a spouse to make payments for the support or maintenance of the other spouse.

As no decree of divorce or separate maintenance was in effect during the years in issue, we must decide whether all or some of the payments were received by or on behalf of Hermine under a written separation agreement.

The term "written separation agreement" is not defined in the Code, the applicable regulations, or in the legislative history. Jacklin v. Commissioner, 79 T.C. 340, 346 (1982); Keegan v. Commissioner, T.C. Memo. 1997-359. A written separation agreement has been interpreted to require a clear statement in written form memorializing the terms of support between the parties. See Jacklin v. Commissioner, supra at 350; Bogard v. Commissioner, 59 T.C. 97, 101 (1972). Letters which do not show a meeting of the minds between the parties cannot collectively constitute a written separation agreement. See

Grant v. Commissioner, 84 T.C. 809, 822-823 (1985), affd. without published opinion 800 F.2d 260 (4th Cir. 1986); Estate of Hill v. Commissioner, 59 T.C. 846, 856-857 (1973); Ewell v. Commissioner, T.C. Memo. 1996-253; Mercurio v. Commissioner, T.C. Memo. 1995-312; Harlow v. Commissioner, T.C. Memo. 1984-393; Greenfield v. Commissioner, T.C. Memo. 1978-386. However, where one spouse assents in writing to a letter proposal of support by the other spouse, a valid written separation agreement has been held to exist. See Azenaro v. Commissioner, T.C. Memo. 1989-224. Furthermore, a written separation agreement will not fail simply because it does not enumerate a specific amount of required support, so long as there is some ascertainable standard with which to calculate support amounts. See Jacklin v. Commissioner, supra at 348-351.

Harvey takes the position that the April 1 and June 1 letters together constitute a written separation agreement within the meaning of section 71(b)(2)(B) under which he paid all amounts stipulated as paid directly to or on Hermine's behalf. We do not believe the April 1 letter constitutes a written separation agreement. Its language is vague (e.g., "Mrs. Leventhal has available to her $450 per week") and when fairly read constitutes at best a set of unilateral proposals or offers. The letter is clearly marked "WITHOUT PREJUDICE", and some items are expressly contingent on Hermine's agreement to take other

actions.  The letter has not been countersigned or otherwise endorsed by Hermine or her attorney.  Thus, the April 1 letter does not memorialize a mutual agreement.

Moreover, Harvey is selective in choosing the terms of the April 1 letter that he argues evidence an agreement regarding Hermine's support.  In an effort to show an agreed $530 per week support obligation, Harvey cites the letter's language in the "Matrimonial Support" paragraph which represents that $450 per week is "available" to Hermine from an account funded by Harvey, that another $200 per week is paid by him, and that $120 per week from these sums is paid by Hermine "for a maid".  However, Harvey ignores language in the same paragraph which represents that he in addition "pays all charge accounts"; he offers no explanation why the purported support agreement embodied in the April 1 letter either includes or excludes an obligation by Harvey to pay charge accounts.

It makes no difference to our conclusion that Harvey generally (though far from consistently) paid Hermine $530 per week during the years in issue, which she accepted and presumably used for her support.  Mere acquiescence and receipt of a payment by the recipient spouse do not transform a unilateral offer of support into the bilateral written agreement contemplated in section 71(b)(2)(B).  See Harlow v. Commissioner, supra; Saniewski v. Commissioner, T.C. Memo. 1979-337; Greenfield v.

Commissioner, supra.  Nor does it matter that Hermine ultimately took the position that Harvey was obligated to pay her $530 per week.  Even if the parties eventually reached some kind of agreement, perhaps an oral one, regarding Hermine's support, there is no evidence of a written agreement in the record, as required by section 71(b)(2)(B).  See Ewell v. Commissioner, supra; Mercurio v. Commissioner, supra; Nemeth v. Commissioner, T.C. Memo. 1982-646.

Harvey argues that Hermine's failure to agree to the April 1 letter in writing does not by itself make the letter insufficient.  In support of this argument, Harvey cites Jefferson v. Commissioner, 13 T.C. 1092 (1949), and Osterbauer v. Commissioner, T.C. Memo. 1982-266, where letters lacking one spouse's written assent were held sufficient for purposes of an alimony deduction.  However, both cases are clearly distinguishable.  Jefferson and Osterbauer construed predecessors of section 71(b)(2)(A) involving the requirement of a "written instrument incident to" a decree of divorce or separation, not the "written separation agreement" requirement presently embodied in section 71(b)(2)(B).  Moreover, the facts in Jefferson and Osterbauer are readily distinguishable from the instant case.  In both prior cases, we found that an oral agreement clearly had been reached prior to its memorialization in a writing.  The evidence in the instant case shows the contrary.  Hermine

vigorously denies in testimony that she agreed to $530 per week as support in connection with the April 1 letter, the April 1 letter is ambiguous regarding the terms of support, and Harvey routinely disregarded his purported obligation to pay this amount; all of which suggests that petitioners had not reached an oral agreement regarding support prior to or by means of the April 1 letter.

Finally, Harvey argues that the "Matrimonial Support" paragraph of the April 1 letter was incorporated by reference in the first of the June 1 letters. This June 1 letter begins:

> With reference to your telephone conversation with my offices yesterday, our prior communications and phone conversations and with specific reference to the Lease from SILVER LAKE ASSOCIATES (Owner) to our Clients (Tenants), it is understood and agreed as follows
> * * *.

Harvey contends that the reference to "our prior communications" incorporated the terms of the April 1 letter. We reject this contention. The reference is too vague to support such a construction, particularly in the context of the specificity with which the June 1 letters address their intended subject of living arrangements.

While the April 1 letter does not constitute or form part of a written separation agreement within the meaning of section 71(b)(2)(B), the June 1 letters are another matter. These letters, written and signed by Hermine's attorney and

countersigned by Harvey's attorney[7] as "UNDERSTOOD, ACCEPTED AND AGREED", outline specific and detailed terms under which Harvey agreed to "pay all normal and usual expenses of maintenance and operation of the marital home and the alternate residence [i.e., the apartment]", and Harvey and Hermine agreed to alternating 2-month occupancy of both premises.

Hermine argues that the June 1 letters are not a written separation agreement because they constitute "only an agreement as to providing a place to live" for her. Respondent appears to agree; while conceding that the June 1 letters constitute a "meeting of the minds", he nevertheless contends that there was no meeting of the minds "on the issue of alimony or separate maintenance". We disagree. To the extent respondent suggests that an agreement to pay Hermine's rent or mortgage is not an agreement to pay alimony, he contradicts his own regulations. See sec. 1.71-1T(b), Q&A-6, Temporary Income Tax Regs., 49 Fed. Reg. 34455 (Aug. 31, 1984) ("cash payments of rent, mortgage, tax, or tuition liabilities of the payee spouse made under the terms of * * * [a] divorce or separation instrument will qualify as alimony or separate maintenance payments"). Hermine points to no authority for the proposition that a written separation agreement must be more comprehensive than providing for shelter,

---

[7] None of the parties dispute that each petitioner's attorney had authorization to execute the letters on that petitioner's behalf.

and we have found none.  Payments to third parties covering

expenses for shelter, such as utilities, pursuant to a divorce or

separation instrument can certainly constitute alimony.  See,

e.g., Graham v. Commissioner, 79 T.C. 415 (1982); Cologne v.

Commissioner, T.C. Memo. 1999-102; Zampini v. Commissioner, T.C.

Memo. 1991-395.

As noted, neither the statute nor the regulations define

"written separation agreement" as used in section 71(b)(2)(B).

With respect to the general requirements of a "written separation

agreement", we have stated:

> Logically, it appears Congress was interested in a
> clear statement in written form of the terms of support
> where the parties are separated.  In this manner it is
> administratively convenient for the Commissioner to
> apprise himself of the amount of gross income to the
> wife and the corresponding deduction allowable to the
> husband. * * *[Bogard v. Commissioner, 59 T.C. 97, 101
> (1972).[8]]

We have rejected the Commissioner's attempt to require

formalities in a separation agreement when we are satisfied that

mutual agreement is evidenced.  See id. (rejecting any

requirement that the agreement recite the fact of separation).

Nor need the agreement state a specific dollar amount of support;

it is sufficient if the agreement states an ascertainable

---

[8] Although Bogard v. Commissioner, 59 T.C. 97 (1972),
construed the meaning of "written separation agreement" as used
in a prior version of sec. 71, the regulations provide that the
term has the same meaning under the current statute.  See sec.
1.71-1T(a), Q&A-4, Temporary Income Tax Regs., 49 Fed. Reg. 34455
(Aug. 31, 1984).

standard.  See Jacklin v. Commissioner, 79 T.C. 340, 351 (1982) (agreement to provide "funds * * * necessary to sustain a standard of living equivalent to that which obtained before the separation" not insufficient as matter of law).  Based on the foregoing authority, we believe petitioners' agreement in the June 1 letters that Harvey would "pay all normal and usual expenses of maintenance and operation" of the two identified residences qualifies as a written separation agreement with ascertainable standards.  That petitioners did not execute a written agreement covering all elements of Hermine's support does not negate the fact that they had a written agreement covering a part.  Accordingly, cash payments received by (or on behalf of) Hermine within the terms of the June 1 letters were payments made "under" a divorce or separation instrument as required by section 71(b)(1)(A).

Applying this conclusion to the payments that were stipulated as made by Harvey either directly to or on behalf of Hermine, we find that some of the payments clearly fall outside the terms of the June 1 letters, which constitute the only section 71(b)(2)(B) written separation agreement established by the evidence.  Specifically, the payments of $26,358.65 in 1990 and $25,012.55 in 1991 stipulated as having been made directly to Hermine by Harvey have not been shown to come within the terms of "normal and usual expenses of maintenance and operation" of the

two residences.  Likewise, the payments of $891.30 in 1990 and $3,623.49 in 1991 that are described as "car payments" in the stipulations do not come within the terms of the June 1 letters. The letters make no mention of car payments, and we do not believe such payments come within any fair reading of "normal and usual expenses of maintenance and operation" of the marital home or apartment.  Thus the direct payments to Hermine and the car payments were not made "under" a divorce or separation instrument and therefore are not includable in the gross income of Hermine under section 71(a) nor deductible by Harvey under section 215(a).

However, the mortgage payments on the marital home and rent for the apartment clearly do come within the terms of the written separation agreement embodied in the June 1 letters and therefore were made "under" a divorce or separation instrument.  We believe the remaining payments, with certain exceptions in the case of "insurance payments", were also made under the terms of the June 1 letters--that is, based on the available evidence, they may fairly be inferred as constituting "normal and usual expenses of maintenance and operation" of the two residences.  We base this conclusion on their stipulated descriptions (relating to utilities, a gardener, a pool, etc.), the undisputed facts that Hermine owned the marital home and regularly occupied it as well as the apartment, and on the stipulation that these payments were

"on behalf of" Hermine.  Although Hermine contends--for the first time on reply brief--that some of these payments have not been shown to be connected to the marital home or apartment, she has offered no evidence to support this speculation; we believe the stipulation that the payments, as described, were "on her behalf" supports the inference that the payments were related to the marital home or apartment in the absence of any other evidence.

We reach a different conclusion with respect to some of the insurance payments.  The stipulated description "insurance payments" is not, on its face, connected with the operation or maintenance of a residence.  Further, there is other evidence in the record bearing upon the appropriate classification of these payments; namely, Harvey's canceled checks and the homeowner's policies on the marital home.  A review of the checks written for insurance and the homeowner's policies shows that $6,724 of the stipulated "insurance payments" of $8,095.12 made in 1990 was for premiums on a homeowner's policy covering the marital home.  The remaining $1,371.12 went towards life insurance or other insurance not shown to be connected to the marital home or apartment.  Similarly, in 1991 $7,471 of the stipulated "insurance payments" of $9,952.07 was for premiums on a policy covering the marital home.  The remaining $2,481.07 went towards

life or other unspecified insurance.[9]  We thus conclude that insurance payments of $6,724 in 1990 and $7,471 in 1991 for coverage of the marital home[10] were made "under" the written separation agreement embodied in the June 1 letters; the remaining insurance payments were not.

Were the Payments to Third Parties Received "on Behalf of" Hermine?

Rule 91(a) contemplates stipulations of matters "[involving] fact or opinion or the application of law to fact."  Rule 91(e) provides generally that a stipulation shall be treated as a conclusive admission by the party to it which the party is not permitted to qualify, change or contradict.  Hermine has stipulated that the payments to third parties at issue in this case were "on Hermine's behalf"; she is therefore generally precluded from qualifying or contradicting that stipulation.  See id.  However, where the Court finds that a stipulation is plainly contrary to the facts revealed by the record, the Court is justified in disregarding the stipulation.  See Jasionowski v.

---

[9]  We note in this regard the likelihood, in the context of the record, that some of the generically described insurance payments were for insurance covering the automobile Harvey was providing for Hermine.

[10]  While a portion of the homeowner policy premiums for the marital home represented extra coverage for "jewelry and furs", we conclude that insurance for such high value contents fairly falls within the terms of "normal and usual expenses of maintenance and operation" of a residence.

Commissioner, 66 T.C. 312, 318 (1976).  Insofar as Hermine's stipulation may be interpreted as expressing a conclusion regarding the application of law to fact--that is, the conclusion that all the stipulated payments were made "on her behalf" for purposes of the legal requirement of section 71(b)(1)(A)--we disregard it because the undisputed facts in this case contradict such a conclusion.

In the instant case, Harvey's payments stipulated as "on Hermine's behalf" covered both his own housing expenses as well as those of Hermine.  It is Harvey's position that the entire amount of the expenses he paid with respect to the marital home and apartment are deductible as alimony, notwithstanding that he occupied each of those properties for approximately the same number of months that Hermine did during the period in issue. What Harvey's argument overlooks is that the separation agreement we have found within the June 1 letters both delineated an obligation for Harvey (payment of the expenses associated with the marital home and apartment) and secured for him a valuable right (sole occupancy for 6 months annually of each residence). Insofar as Harvey's payments secured for him a right of occupancy and defrayed the costs of his occupancy, we conclude that they were not made "on behalf of" Hermine within the meaning of section 71(b)(1)(A).  They are instead merely "personal" or "living" expenses, nondeductible under section 262(a).  Cf.

Cologne v. Commissioner, T.C. Memo. 1999-102 (spouses separately using jointly owned second residence on equal basis pursuant to written separation agreement; husband paying all utilities entitled to alimony deduction for one-half of same).

We shall determine which portion of the payments made by Harvey with respect to the marital home and apartment related to his own occupancy based on the available evidence in the record. The June 1 letters indicate that both petitioners were tenants with respect to the lease of the apartment and provided that they would equally share occupancy in alternating 2-month intervals. Payments of the rent obligations of the payee spouse under the terms of a divorce or separation instrument are payments "on behalf of" the payee spouse that qualify as alimony. Sec. 1.71-1T(b), Temporary Income Tax Regs., 49 Fed. Reg. 34455 (Aug. 31, 1984). Thus, we conclude that one-half of the rent payments satisfied Hermine's liabilities and related to her occupancy of the apartment, making them deductible as alimony by Harvey, and includable in Hermine's income, pursuant to sections 215(a) and 71(a), respectively. The remaining one-half of the rent payments related to the occupancy of Harvey and are not deductible by him or includable by her. Similarly, we conclude that one-half of the payments for furniture rental, to Brooklyn Union Gas, to a gardener, to Con Edison for electricity, to Quinlan Oil, to Town & County Pool, to New York Telephone, and for miscellaneous

plumbing, electrical, and water expenses, whether made with respect to the marital home or the apartment, related to the occupancy of Harvey. These expenditures do not appear to have been capital in nature but merely ordinary expenses of operation and maintenance. Thus, one-half of these payments were not received "on behalf of" Hermine. The remainder were, and are therefore alimony includable in Hermine's income and deductible by Harvey.

The mortgage payments on the marital home and payment of premiums on the homeowner's policies covering the home require different treatment. Hermine held sole title to the marital home. Neither Hermine nor Harvey offered evidence concerning the terms of the mortgage indebtedness on it. In the absence of any other evidence, we rely on Hermine's stipulation that the mortgage payments on the marital home were "on her behalf" to conclude that Hermine alone was liable on the indebtedness. The temporary regulations provide that payment of the mortgage liabilities of the payee spouse under the terms of a divorce or separation instrument qualifies as alimony, see sec. 1.71-1T(b), Q&A-6, Temporary Income Tax Regs., supra, and thus an amount equal to the stipulated mortgage payments on the marital home must be included in income by Hermine and is deductible by

Harvey.[11]  Likewise we believe the entire amount of the payments for the homeowner's insurance covering the marital home is alimony income to Hermine and a deduction for Harvey.  We reach this conclusion because Hermine stipulated that such payments were "on her behalf", she is the named insured on the policies, and the insurance primarily protected real property owned by her.  The question arises, should only one-half of the mortgage payments or homeowner's insurance premiums be considered to be "on behalf of" Hermine due to Harvey's half-time occupancy of the marital home?  We think not, in light of a position taken in the temporary regulations.  The temporary regulations provide:

> Any payments to maintain property owned by the payor spouse and used by the payee spouse (including mortgage payments, real estate taxes and insurance premiums) are not payments on behalf of a spouse even if those payments are made pursuant to the terms of the divorce or separation instrument. [Sec. 1.71-1T(b), Q&A-6, Temporary Income Tax Regs., supra.]

We infer from the regulation that payments on a mortgage or of insurance or taxes relating to property owned by one spouse do not benefit, and are not "on behalf of", the nonowner spouse who (merely) uses the property pursuant to a divorce or separation instrument.  Thus the mortgage and homeowner's insurance payments

---

[11]  To the extent the mortgage payments included "qualified residence interest" within the meaning of sec. 163(h), Hermine may be entitled to a deduction for such interest in the year paid.  We expect the parties to address this issue as part of their Rule 155 computations.

are entirely "on behalf of" Hermine, notwithstanding Harvey's part use of the marital home.

Would Harvey's Liability for the Payments Have Terminated With Hermine's Death?

Under section 71(b)(1)(D), liability to make payments must terminate on the death of the payee spouse for such payments to qualify as "alimony or separate maintenance payments". Respondent, citing section 1.71-T(b), Q&A-11, Temporary Income Tax Regs., 49 Fed. Reg. 34456 (Aug. 31, 1984), argues that even if we find a written separation agreement did exist, such an agreement is insufficient because it does not state that liability for payments terminates on the death of Hermine.[12] However, Congress amended section 71(b)(1)(D) in 1986, after the promulgation of the temporary regulations, specifically to remove the requirement that a divorce or separation instrument affirmatively state that liability terminates upon the death of the payee spouse, effective for instruments executed after

---

[12] Sec. 1.71-1T(b), Q&A-11, Temporary Income Tax Regs., 49 Fed. Reg. 34456 (Aug. 31, 1984), states:

Q-11.  What are the consequences if the divorce or separation instrument fails to state that there is no liability for any period after the death of the payee spouse to continue to make any payments which would otherwise qualify as alimony or separate maintenance payments?
A-11.  If the instrument fails to include such a statement, none of the payments, whether made before or after the death of the payee spouse, will qualify as alimony or separate maintenance payments.

December 31, 1986. See Tax Reform Act of 1986, Pub. L. 99-514, sec. 1843(b), 100 Stat. 2085, 2853. Thus, payments qualify so long as termination would occur under State law. See Notice 87-9, 1987-1 C.B. 421, 422; Human v. Commissioner, T.C. Memo. 1998-106. In the instant case, the June 1 letters are silent as to whether Harvey is liable to make any payments after the death of Hermine, but Harvey argues that the payments would otherwise terminate under New York law. We agree.

> Under New York law, "maintenance" is defined as:
>
> payments provided for in a valid agreement between the parties or awarded by the court in accordance with the provisions of subdivision six of this part, to be paid at fixed intervals for a definite or indefinite period of time, but an award of maintenance shall terminate upon the death of either party or upon the recipient's valid or invalid marriage, or upon modification pursuant to * * * [sec. 236B9.b.]. [N.Y. Dom. Rel. Law sec. 236B1.a. (McKinney 1999); emphasis added.]

Thus, the statute differentiates between maintenance payments made pursuant to agreement and those made under court decree. See Scheinkman, Practice Commentaries, in McKinney's Consol. Laws of N.Y., Book 14, Domestic Relations Law C236B:10, at 330-331 (1999). With respect to court-awarded maintenance, the payments automatically terminate upon any of the events listed in the statute (terminating events). See id. In the case of maintenance payments made pursuant to agreement, the obligation generally terminates upon the death of either spouse, but the parties may modify or extend the duration of the payments by

agreement.  See <u>In re Riconda</u>, 688 N.E.2d 248, 251 (N.Y. 1997) ("Generally, the obligation to make maintenance payments terminates upon the death of either party"); 2 Foster et al., Law and the Family New York, sec. 12:57 (2d ed., 1988 & Supp. 1999); 4 New York Civil Practice:  Matrimonial Actions, sec. 51.02[6] (1998).[13]  Because there is nothing in the record to indicate that Harvey had agreed or was otherwise obligated to make the payments required by the June 1 letters after Hermine's death, the requirement of section 71(b)(1)(D) is satisfied.[14]

<u>Conclusion</u>

For the reasons discussed above, Harvey's direct payments to Hermine of $26,358.65 in 1990 and $25,012.55 in 1991 and the stipulated "car payments" of $891.30 in 1990 and $3,623.49 in 1991 do not qualify as alimony or separate maintenance payments

---

[13]  Although we concluded in <u>Megibow v. Commissioner</u>, T.C. Memo. 1998-455, that a payment liability at issue therein did not automatically terminate on the death of the payee spouse under New York law, the single payment at issue in that case had the appearance of an equitable distribution, and the payor's liability would therefore not have terminated on the death of the payee spouse.

[14] Although in the event of Hermine's death, Harvey might remain contractually liable to third parties for some of these payments (e.g., apartment rent, utility bills, etc.), any such post mortem payments would no longer be received "on behalf of" Hermine.  <u>Israel v. Commissioner</u>, T.C. Memo. 1995-500; cf. <u>Cologne v. Commissioner</u>, T.C. Memo. 1999-102 (fact that husband's liability for utility bills on shared second residence would continue after wife's death does not disqualify alimony deduction under sec. 71(b)(1)(D) for utility payments attributable to wife's use).

under section 71(b).  However, the mortgage payments on the marital home of $8,331.02 for 1990 and $9,166 for 1991 do so qualify.  In addition, one-half of the rent for the apartment and one-half of the amounts stipulated as paid for furniture rental, to Brooklyn Union Gas, to the gardener, to Con Edison, to Quinlan Oil, to Town & Country Pool, to New York Telephone, and as miscellaneous expenses for plumbing, electricity, and water qualify as alimony or separate maintenance payments; the other half does not.  Finally, $6,724 in 1990 and $7,471 in 1991 of the stipulated insurance payments which the record demonstrates were for homeowner's policies covering the marital home, qualify as alimony or separate maintenance payments; the remaining insurance payments do not.  Thus, in total, Harvey is entitled to deduct as alimony $23,867.52 for 1990 and $23,877.63 for 1991, and Hermine must include these amounts as gross income.

To reflect the foregoing and concessions,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.