EDWARD JASIONOWSKI AND JANE JASIONOWSKI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3057-74.     Filed May 19, 1976.

---

[2] See *J. Morgan Wilson,* a Memorandum Opinion of this Court dated Feb. 21, 1952.

*Leonard Bailin,* for the petitioners.
*Carolyn J. Chabora,* for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioners' income tax of $3,489.12 for 1969 and $6,784.03 for 1970. In an amended answer, respondent also claims that petitioners understated their gross rental income in 1969 and 1970 in the respective amounts of $201.92 and $161.74. Concessions having been made, the issues remaining for our decision are as follows:

(1) Whether, and to what extent, petitioners understated their gross rental income for taxable years 1969 and 1970;

(2) Whether expenses incurred by petitioners during 1969 and 1970 in connection with the rental of a house to a third person are deductible under section 161 et seq; [1]

(3) If so, in depreciating the house during 1969 and 1970, (a) whether petitioners used the correct basis for the house, and (b) whether they are limited to the straight line method of depreciation.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Edward and Jane Jasionowski (hereinafter petitioners) filed joint Federal income tax returns for taxable years 1969 and 1970 with the District Director in Newark, N.J. Petitioners resided in Sayreville, N.J., at the time the petition herein was filed.

The issues in the instant case relate to a lease agreement entered into in 1968 between petitioners and Anna E. Schmitt (Schmitt).

During 1969 and 1970, petitioner Edward Jasionowski (Jasionowski) was a medical doctor specializing in obstetrics and was a stockholder and physician employee of Sayreville Medical Group, P.A.

---

[1] Unless otherwise indicated all statutory references are to the Internal Revenue Code of 1954.

Schmitt had known Jasionowski since 1947 when Jasionowski began practicing medicine in Sayreville. Both Schmitt and her mother and father (who died in 1952 and 1954, respectively) were patients of Jasionowski. Schmitt thought very highly of Jasionowski as both a doctor and a friend, and their families were acquainted with each other over the years.

In November 1965, at which time Schmitt was approximately 55 years of age, she had a heart attack and was thereafter unable to work. In December 1965, she drew up a will in which she left her house located at 37 Quaid Street in Sayreville to Jasionowski. She included this provision in her will because she no longer had any family and because she wanted to repay Jasionowski for the kindness he had shown to her mother and father.

In 1966 Schmitt broke her hip and by 1968, because of her high medical bills, she determined that she could no longer continue to make the mortgage payments on her house. In order to avoid foreclosure, she told Jasionowski that she would like to give him her house. He said he would consider her offer and, about 1 week later, he told her he would accept the house and suggested that he would lease the house to her at a minimal rent so she could continue to live there. Accordingly, on June 14, 1968, Schmitt deeded the house to petitioners.

Schmitt had purchased the land upon which the house is situated for $2,054.50 in September 1959, and in February 1961, she had the house constructed at a cost of $15,060.78. Schmitt obtained a $10,000 mortgage on the house in February 1961. On June 14, 1968, the date she deeded the house to petitioners, the balance of the mortgage amounted to $7,713.85, and the fair market value of the house was at least $24,000.

Also on June 14, 1968, petitioners and Schmitt entered into a lease agreement covering a period of 7 years beginning June 14, 1968. Pertinent terms of this lease were:

SAID Tenant shall pay as rental for said premises all taxes, ordinary as well as extraordinary, of every kind, that may be levied upon or assessed against said premises, or any part hereof, during the term of this lease, and all gas, light and heat, and water rents, and during said term, keep said premises insured against loss or damage by fire in an amount not less than $20,000.00, and pay the premiums for such insurance; it also being the intent hereof that the Tenant shall bear all expenses connected with the maintenance and painting of said premises except for the painting and maintenance to be performed during the year 1968. Capital improvements shall be the responsibility of the Landlord.

UPON expiration of the term of this Lease, the Landlord and Tenant shall renegotiate a new lease at terms agreeable to both. Said Lease shall provide for a net annual rent of 5% on the value of the premises at that time after payment of taxes, utilities and insurance.

NON PAYMENT of rental shall not be a default until same has exceeded four months.

Schmitt lived in the house for the full 7 years of the lease, and still lived there at the time of the trial of this case (3 months after expiration of the lease).

During the years at issue, petitioners reported as income on their returns rental payments received from Schmitt as follows:

| | Taxes | Insurance | Total rent received | Gross rental income returned |
|---|---|---|---|---|
| 1969 | $408.58 | $202 | $610.58 | $408.66 |
| 1970 | 467.58 | 202 | 669.58 | 507.84 |

On their respective 1969 and 1970 returns, petitioners claimed the following expenses attributable to the house and land as rental expense deductions:

| | 1969 | 1970 |
|---|---|---|
| Plumbing | $24.88 | 0 |
| Interest | 437.22 | $411.17 |
| Insurance | 202.00 | 202.00 |
| Taxes | 408.58 | 467.58 |
| Depreciation: | | |
| Building | 1,638.91 | 1,507.80 |
| Carpet | 70.00 | 70.00 |
| Total | 2,781.59 | 2,658.55 |

Because he determined that petitioners' rental of the house to Schmitt did not constitute a trade or business, respondent disallowed the following claimed rental expense deductions:

| | 1969 | 1970 |
|---|---|---|
| Plumbing | $24.88 | 0 |
| Insurance | 202.00 | $202.00 |
| Depreciation: | | |
| Building | 1,638.91 | 1,507.80 |
| Carpet | 70.00 | 70.00 |
| Total | 1,935.79 | 1,779.80 |

On their 1968, 1969, and 1970 returns, petitioners used the double-declining method of depreciation in calculating the depreciation on the house for those years. Although petitioners now concede that such method was improper, respondent has

never disallowed the $853.60 depreciation deduction taken on their 1968 return.

On several occasions when he visited Schmitt, Jasionowski noticed that she nearly slipped on her rug. Because he was concerned for her safety, he purchased a new carpet for the house in 1969 for $700. In both 1969 and 1970 he claimed a $70 depreciation deduction for the carpet.

In both 1969 and 1970, petitioners were also the lessors of an office building located in Sayreville. In 1969 and 1970 they earned net income of $2,745.52 and $2,607.81, respectively, from the rental of this property. On their 1969 and 1970 returns, petitioners reported adjusted gross income of $48,583.75 and $66,605.20, respectively.

Since acquiring the house in 1968 from Schmitt, petitioners have never made any attempt to sell the property. Although petitioners have never attempted to ascertain the amount of rent they could command on the open market, Jasionowski was of the opinion that in 1968 a fair market rental would have been between $1,500 and $1,800 per year.

## OPINION

The first issue we must decide is whether petitioners understated their gross rental income in 1969 and 1970.

On their returns for 1969 and 1970, petitioners reported gross rental income of $408.66 and $507.84, respectively. In accordance with Rule 91, Tax Court Rules of Practice and Procedure, the parties made the following stipulation of fact:

During the taxable years 1969 and 1970 Anna E. Schmitt paid a total of $408.66 and $507.84, respectively to the petitioners as rent which was included as rental income on the petitioners respective 1969 and 1970 federal income tax returns.

At trial, petitioners called Schmitt as a witness and, during cross-examination by respondent's counsel, Schmitt testified that during each of the years at issue she paid the amount of the insurance premiums and taxes directly to petitioners as rent. Under cross-examination, Jasionowski also testified that he and his wife received the amount of these two items from Schmitt as rental income during 1969 and 1970. Respondent's counsel pointed out to him that, in both 1969 and 1970, the amount of the taxes and insurance deducted by petitioners as business expenses exceeded the amounts returned as gross rental income. Jasionowski

conceded that an error had been made and that there was a discrepancy between the rental income received in 1969 and 1970 and the amounts returned for those years.

In light of the foregoing testimony, respondent's counsel, during the course of the trial, moved that the above-quoted stipulation be stricken from the record and that she be permitted to file an amendment to respondent's answer to conform the pleadings to the proof concerning the apparent understatement of petitioners' income for the years at issue. We granted both motions from the bench. Subsequently, respondent filed an amended answer which claimed that evidence introduced at trial proves that petitioners understated their gross rental income in 1969 and 1970 in the amounts of $201.92 and $161.74, respectively.

Because the claim for the increased deficiency was asserted by respondent before the conclusion of the hearing of this case, we have jurisdiction to redetermine such deficiency. Sec. 6214(a). Even though we have jurisdiction, we need not allow respondent to amend his answer unless we are of the opinion that such amendment is warranted by the facts presented before us. *Commissioner v. Long's Estate*, 304 F.2d 136 (9th Cir. 1962). We think that respondent's amendment is warranted in this instance.

Based on petitioners' 1969 and 1970 returns, the amount of taxes and insurance on the property amounted to $610.58 in 1969 and $669.58 in 1970. Petitioners, however, showed gross rental income from this property of $408.66 for 1969 and $507.84 for 1970. Schmitt testified that in 1969 and 1970 she paid the amount of taxes and insurance on the property directly to petitioners. Jasionowski confirmed this testimony without reservation. He admitted that there was a discrepancy between the amounts received as rental income during the years at issue and the amounts returned for such years.

We realize that the insertion of a new issue by one party during the course of a trial may unfairly surprise and unduly hardship the other, and we are not insensitive to this problem. However, we fail to see how petitioners can properly rely on these contentions when Jasionowski conceded that there had been an error and that Schmitt had paid the taxes and insurance as rent during the years at issue.

Petitioners, although conceding that the facts presented at trial were in variance with the above-quoted stipulation of fact, nevertheless argue that this Court should be bound by the stipulation agreed to by the parties. We do not lightly disregard facts to which the parties have stipulated; however, where such facts are clearly contrary to facts disclosed by the record, we refuse to be bound by the stipulation. *William Ernest Seatree,* 25 B.T.A. 396, 401 (1932); *Edwin L. Dana,* 36 B.T.A. 231, 237 (1937); *T.K. Harris Co.,* 38 B.T.A. 383, 386 (1938).

The burden of proving the increased deficiency falls upon respondent, and we think that the testimony elicited from Schmitt and Jasionowski under cross-examination is more than sufficient to carry such burden. Accordingly, we hold that petitioners' gross rental income for 1969 and 1970 was understated by $201.92 and $161.74, respectively.

The second issue presented for our decision involves the deductibility of the losses claimed by petitioners in connection with the rental of the house to Schmitt.

On their 1969 and 1970 returns, petitioners deducted expenses and depreciation which exceeded the amount of rent received from Schmitt in those years. Respondent has allowed as itemized deductions the amount of interest and taxes paid on the property but, because he determined that the rental activity was not a trade or business, respondent disallowed the deductions taken for the remaining expenses and depreciation. Respondent's position is that petitioners' primary purpose in renting the house to Schmitt was to benefit her and not to make a profit. Thus, respondent argues that without the requisite profit motive the leasing arrangement cannot be considered a trade or business for purposes of deducting any losses incurred. Petitioners, quite naturally, argue to the contrary.

The operating expenses and depreciation relating to renting the house to Schmitt would be deductible business expenses if the property were either used in a trade or business or held for the production of income. Secs. 162(a), 167(a)(1) and (2), and 212.[2]

---

[2] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

The losses incurred would be deductible if incurred either in a trade or business or in a transaction entered into for profit. Secs. 165(a), and 165(c)(1) and (2).[3]

Regardless of whether the focus is placed on the deductibility of the expenses and depreciation or on the losses incurred, before any deduction can be allowed it must be shown that the activity in question was undertaken with the primary intention and motivation of making a profit. *Lamont v. Commissioner,* 339 F.2d 377 (2d Cir. 1964); *Hirsch v. Commissioner,* 315 F.2d 731 (9th Cir. 1963); *Margit Sigray Bessenyey,* 45 T.C. 261 (1965); *Samuel Yanow,* 44 T.C. 444 (1965).

The fact that during the years at issue petitioners incurred losses instead of profits in connection with leasing the house to Schmitt does not, in itself, negate the presence of a profit motive. Rather, nonprofitability is simply evidence to be considered in determining the existence of the alleged trade or business. *Wiles v. United States,* 312 F.2d 574 (10th Cir. 1962). Whether petitioners had the required intention to make a profit is a question of fact which we must answer from the record before us. *Theodore Sabelis,* 37 T.C. 1058 (1962). We have carefully examined the record, and we must agree with and hold for respondent on this issue.

With respect to 1969 our inquiry is guided by a vast amount of case law in this area. However, with respect to 1970, we must consider section 183, "Activities Not Engaged in for Profit," which replaced section 270 (the so-called "hobby loss" provision) for taxable years beginning after December 31, 1969.[4]

---

(1) of property used in the trade or business, or
(2) of property held for the production of income.
SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.
In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
(1) for the production or collection of income;
(2) for the management, conservation, or maintenance of property held for the production of income; * * *
[3] SEC. 165. LOSSES.
(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
* * *
(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—
(1) losses incurred in a trade or business;
(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *
[4] SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

The somewhat enigmatic language of section 183 can be better understood by viewing that section in the context of its position in the Code. Section 183 is found in subtitle A, chapter A, subchapter B, part VI, entitled "Itemized Deductions for Individuals and Corporations." The first section under part VI is section 161, which provides, in part, "in computing taxable income under section 63(a), there shall be allowed as deductions the items specified in this part."

Such specified deductible items include, among numerous others, trade or business expenses (sec. 162), interest (sec. 163), and taxes (sec. 164). Viewed in the context of its position in part VI, section 183 is simply a statute that allows certain deductions attributable to "activities not engaged in for profit" in computing taxable income under section 63(a). Section 183(c) defines an "activity not engaged in for profit" as an activity for which deductions under section 162 or section 212(1) or (2) would not be allowable.[5]

If under subsection (c) an activity is determined to be not engaged in for profit, the allowable deductions attributable to such activity are set forth in section 183(b). In general the statutory scheme of section 183(b) is as follows: paragraph (1) allows all those deductions that are not predicated on the existence of a profit motive (e.g., interest and taxes) and paragraph (2), in addition, allows all deductions which do depend upon the existence of a profit motive (e.g., depreciation and trade or business expenses). These paragraph (2) deductions, however, are deductible *only to the extent* that the gross income from such activity exceeds those deductions allowable under paragraph (1).

(a) GENERAL RULE.—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

[5] SEC. 183(c). ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

In other words, a taxpayer will only be permitted to utilize paragraph (2) deductions when his gross income from the activity not engaged in for profit exceeds the paragraph (1) deductions and, then, only to the extent of such excess.

The legislative history surrounding section 183 indicates that one of the prime motivating factors behind its passage was Congress' desire to create an objective standard to determine whether a taxpayer was carrying on a business for the purpose of realizing a profit or was instead merely attempting to create and utilize losses to offset other income. S. Rept. No. 91-552, to accompany H.R. 13270 (Pub. L. 91-172), 91st Cong., 1st Sess. 104 (1969).

In an effort to comply with the congressional purpose of establishing objective tests to determine subjective intentions, the Commissioner promulgated regulations under section 183 which set forth nine separate factors which should be examined in making a profit-motive determination. Sec. 1.183-2(b)(1)-(9), Income Tax Regs. The regulations further provide, however, that these enumerated factors are neither exclusive nor necessarily controlling in each case and that "all the facts and circumstances with respect to the activity are to be taken into account." Sec. 1.183-2(b), Income Tax Regs.[6]

Further, we note that the test under section 183 is not whether the taxpayer's intention and expectation of profit is reasonable but rather whether such intention and expectation is bona fide. S. Rept. No. 91-552, *supra* at 103; sec. 1.183-2(a), Income Tax Regs.; *Francis X. Benz,* 63 T.C. 375 (1974).

Although section 183 has clearly placed a gloss on post-1969 judicial profit-motive inquiries, we think pre-1969 case law in this area remains relevant. We say this for two reasons. First, section 183(c) defines an "activity not engaged in for profit" as an activity with respect to which deductions would not be allowable under section 162 or section 212(1) or (2). Thus, prior cases dealing with profit motive under these sections retain their vitality. Second, the so-called "relevant factors" set forth in the regulations are themselves derived from prior case law, *Francis*

---

[6] Because of the breadth of the statutory language, sec. 183 is clearly applicable in the instant case. However, the legislative history behind that section indicates that it was primarily directed at losses incurred in farming and other "hobbies." S. Rept. No. 91-552, to accompany H.R. 13270 (Pub. L. 91-172), 91st Cong., 1st Sess. 103 (1969). Therefore, while we think the section must be considered, we have not found the enumerated "relevant factors" in the regulations very helpful.

*X. Benz, supra,* and, therefore, we think such prior law has a role to play in their application.

Accordingly, determinations as to the existence or absence of a profit motive, whether directed toward years beginning prior or subsequent to December 31, 1969, will quite often be identical. *Francis X. Benz, supra.* We think the instant case presents such a situation.

We simply are unable to understand how we can impute a profit motive to petitioners when they voluntarily entered into a lease agreement under which, for a period of 7 consecutive years, they were bound to incur losses as distinguished from the usual "start-up" situation where early losses are anticipated but where effort and imagination could turn the venture toward profits rather quickly.

Ignoring depreciation for the moment, petitioners could never recover even their fixed out-of-pocket expenses (taxes, insurance, and interest) since, under the terms of the lease, the rent was limited to the amount of the taxes and insurance. When depreciation is added in, petitioners' expenses exceeded their rental income at about a 7-to-1 ratio for 1969, and a 5-to-1 ratio for 1970. Such evidence belies the existence of any profit motive.[7]

Although petitioners never attempted to determine a fair market rental value for the house, Jasionowski was of the opinion that such a rental would have been between $1,500 and $1,800 annually; nevertheless, petitioners consented to enter into a lease which earned them only $610.58 in 1969, and $669.58 in 1970. This voluntary acceptance of rent at an amount substantially below fair market value is a clear indication to us that petitioners' primary and dominant motivation was to help a long-time friend who had become infirm and destitute. Such a motive, while no doubt laudatory, should not be confused with an intention to make a profit. See *Henry P. White,* 23 T.C. 90 (1954).

We find additional evidence indicating the absence of the requisite profit motive from the fact that, during the years at issue, petitioners received substantial income from Jasionowski's medical practice. Sec. 1.183-2(b)(8), Income Tax Regs. Moreover, we note that petitioners were not novices in the rental business and made profits from the commercial property they leased. We can only conclude that their failure to do likewise

---

[7] See *Alfred M. Cox,* T.C. Memo. 1965-5; *Mel Dar Corp.,* T.C. Memo. 1960-56.

with respect to the Schmitt lease was a result of their benevolence rather than ineptitude.

Petitioners argue that their delay of 1 week before accepting Schmitt's gift of the house is evidence that they carefully considered the financial aspects prior to acceptance and that such consideration is evidence of their profit motive. We think this argument misses the point. We are not concerned here with petitioners' motive in accepting the house but rather with their motive in renting it to Schmitt. The fact that they spent a week considering the financial ramifications of accepting the proposed gift of Schmitt's house does not explain to us why they thereafter entered into a 7-year lease under which they were guaranteed to lose money each and every year. Furthermore, the circumstance of the gift and the lease having been made on the same date argues strongly that this was a package deal.

We are likewise unpersuaded by petitioners' argument that their primary intent was to earn lucrative rental income after the expiration of the lease and make capital gains on the eventual sale of the house.

First, we do not think that any profit motive petitioners may have harbored for the period following the lease's expiration can be substituted for their intentions during the actual term of the lease. Second, if the anticipation of eventually selling the house at a profit were in itself sufficient to establish that the property was held with a profit-making intent, rare indeed would be the homeowner who purchased a home several years ago who could not make the same claim. See *Mel Dar Corp. v. Commissioner,* 309 F.2d 525 (9th Cir. 1962), affg. a Memorandum Opinion of this Court. On this same point, we note that petitioners have never offered the house for sale.

For the foregoing reasons, we sustain respondent's disallowance of the business expense, depreciation, and loss deductions claimed by petitioners for 1969. As for 1970, we hold that petitioners' lease arrangement with Schmitt constituted an "activity not engaged in for profit" within the meaning of section 183(c) and the applicable regulations. Accordingly, petitioners are entitled to the deductions claimed for interest and taxes, and respondent has so conceded. However, since petitioners' gross income under this lease agreement did not exceed the amount of interest and taxes, there is no excess gross income against which to apply the

claimed business and depreciation expenses. Therefore, such claimed deductions must be disallowed.

Because of our holding on this issue, we find it unnecessary to reach the questions raised concerning the amount of the depreciation deductions taken on the house.

*Decision will be entered under Rule 155.*