T.C. Memo. 2011-274

UNITED STATES TAX COURT

MARY A. PENLAND, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6241-07.                    Filed November 17, 2011.

Mary A. Penland, pro se.

<u>Bradley C. Plovan</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  On December 15, 2006, the respondent ("the IRS") issued the petitioner, Mary A. Penland, a notice of deficiency for tax years 1998, 1999, and 2001 (years at issue). The notice stated that the IRS determined (i) that she had deficiencies in taxes of $2,048,607 for 1998, $558,401 for 1999, and $686,371 for 2001; (ii) that she was liable for additions to

tax under section 6651(a)(1)[1] of $512,401.75 for 1998 and $23,477 for 1999; and (iii) that she was liable for an addition to tax under section 6654(a) of $93,740.61 for 1998.

On March 15, 2007, Mary Penland filed a petition disputing the IRS's determinations; she was a South Carolina resident at the time. The IRS concedes that she is not liable for the addition to tax under section 6654(a) for 1998. In deciding whether to sustain the remaining determinations in the notice of deficiency, we resolve the following issues:

A.  Did Mary Penland own all shares of Penco, Inc., an S corporation, during the years at issue? (We conclude that she owned all shares of Penco.)

B.  Did Penco own Woodruff Auto Sales,[2] a sole proprietorship, during the years at issue? (We conclude that it did own Woodruff.)

C.  Did Penco own Sweet Water Miniature Horses, Inc.,[3] during the years at issue? (We conclude that it did not own Sweet Water.)

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code, as amended, effective for the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2]We refer to Woodruff Auto Sales as either "Woodruff Auto Sales" or "Woodruff".

[3]We refer to Sweet Water Miniature Horses, Inc. as either "Sweet Water Miniature Horses" or "Sweet Water".

D. Was the IRS's disallowance of Penco's net section 1231 losses (other than due to casualty or theft) proper? (We conclude that it was proper.)

E. Is Mary Penland entitled to carry a net operating loss from 2000 to the years at issue? (We conclude that she is not so entitled.)

F. Did Mary Penland pay her tax liabilities by abandoning her rights to Penco's assets? (We conclude that she did not so pay her liabilities.)

G. Did the receiver appointed to manage Penco's assets assume Mary Penland's income-tax liabilities for the years at issue, thus relieving her of liability? (We conclude that the receiver did not assume her liabilities.)

H. Was the IRS's determination that section 446 required Penco to use the accrual method of accounting an abuse of discretion? (We conclude that it was not an abuse of discretion.)

I. Was the IRS's determination that Penco must take into account a section 481(a) adjustment for 1998 proper? (We conclude that the determination was improper.)

J. Is Mary Penland liable for the section 6651 late-filing penalty for 1998 and 1999? (We conclude that she is liable.)

FINDINGS OF FACT

The parties stipulated some facts; those facts are so found.

Before 1998

Before 1998, Mary Penland's husband (Charles Penland) owned Woodruff Auto Sales, a used-car business that maintained an inventory of vehicles for sale. Charles Penland apparently operated Woodruff as a sole proprietorship, not as a corporation.

Sweet Water Miniature Horses was in the business of buying, selling, and breeding miniature horses. It is unclear who owned Sweet Water before the years at issue--1998, 1999, and 2001. And it is unclear what type of entity Sweet Water was for federal income-tax purposes--e.g., a sole proprietorship or a C corporation--both before and during the years at issue.

Penco, Inc., was a South Carolina corporation. It was incorporated on October 29, 1996, by an attorney named Terry Clark. As reflected in Penco's corporate records, on November 1, 1996: (i) Clark transferred his rights in Penco to Mary Penland; (ii) Penco named Mary Penland its sole officer; and (iii) Penco issued Mary Penland all of its stock.[4]

---

[4]That Mary Penland's ownership of Penco began on Nov. 1, 1996, is a fact stated in pars. 11 and 12 of the stipulation. The Nov. 1, 1996 date is contradicted by par. 4 of the stipulation, which states: "Beginning in 1998 and through the years at issue [1998, 1999, and 2001], petitioner [Mary Penland] was the sole owner of Penco, Inc. ('Penco')." Even if her ownership started in 1998, it would not matter here because as par. 4 says, her ownership was coextensive with the years 1998, 1999, and 2001, the years at issue.

1998-2001

The parties stipulated that Mary Penland owned Penco during the years at issue--1998, 1999, and 2001. She now contends that she did not. As we explain infra part A, we conclude that she is bound by her stipulation.

The parties stipulated that Charles Penland transferred Woodruff Auto Sales to Penco in 1998. Mary Penland now contends that the transfer did not occur. As we explain infra part B, we conclude that she is bound by her stipulation. There is no evidence that Penco disposed of Woodruff during the years at issue. We therefore conclude that Penco owned Woodruff during 1998, 1999, and 2001.

Mary Penland concedes that Penco did not own Sweet Water Miniature Horses during the years at issue. See infra part C. For the years at issue Penco filed Forms 1120S, U.S. Income Tax Return for an S Corporation, which Mary Penland signed. Attached to each of these returns was a Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc. Each Schedule K-1 reported that Mary Penland was Penco's sole shareholder. The returns computed Penco's taxable income using the cash method of accounting and reported the income, losses, and expenses of both Woodruff Auto Sales and Sweet Water Miniature Horses.

Attached to the 1999 and 2001 returns were Forms 4797, Sales of Business Property; no Form 4797 was attached to Penco's 1998

return.  On the Forms 4797, Penco reported that its net section 1231 losses (other than due to casualty or theft)[5] were $927,290 for 1999 and $37,736 for 2001.

Mary Penland filed Forms 1040, U.S. Individual Income Tax Return, for 1998, 1999, and 2001.  She filed her 1998 return on September 8, 2003, her 1999 return on September 22, 2000, and her 2001 return on July 26, 2002.  Each of her income-tax returns reported her 100-percent share of Penco's income, expenses, and other tax attributes.  The returns also reported that she earned wages from Woodruff Auto Sales of $15,750 in 1999 and $39,000 in 2001.  Her filing status each year was married filing separately.

2002-2005

The record does not reveal whether the ownership of Penco, Woodruff Auto Sales, or Sweet Water Miniature Horses changed from 2002 to 2005.  Thus it is unclear whether, after 2001, the ownership of these entities was the same as it was at the end of 2001, when Mary Penland owned 100 percent of the shares of Penco, Penco owned Woodruff as a sole proprietorship, and Penco did not own Sweet Water.

---

[5]A sec. 1231 loss is a loss from the sale, exchange, or conversion of (i) property used in a trade or business or (ii) capital assets held for more than one year in connection with a trade or business or in connection with a transaction entered into for profit.  Sec. 1231(a)(3).

2005-Present:  Charles Penland's Criminal Proceedings

In July 2005, a federal grand jury indicted Charles Penland for various drug and money-laundering offenses.  See Indictment, United States v. Penland, No. 7:05-cr-00710-HFF (July 12, 2005), ECF No. 27.[6]  On March 3, 2006, the United States filed a bill of particulars which contained a list of properties that the government alleged to be forfeitable on conviction.  One of the entries on the list of properties was Penco's "business assets and corporate interests * * * including but not limited to all monies, claims, interests and accounts receivable payable to or received by * * * [Penco]".  Government's Third Bill of Particulars for Forfeiture of Property at 6-7, United States v. Penland, No. 7:05-cr-00710-HFF (Mar. 3, 2006), ECF No. 224.  The bill of particulars also specified real properties[7] that the government intended, if necessary, to seek forfeiture of as

---

[6]We take judicial notice of the public record of Charles Penland's criminal proceedings in the U.S. District Court for the District of South Carolina.  See Fed. R. Evid. 201.

[7]Among those real properties was 2.837 acres of land that the bill of particulars identified as "Woodruff Auto Sales", "300 Cross Anchor Highway", "Woodruff, South Carolina 29388".  The bill of particulars alleges that this parcel was titled in the name of "South Carolina Investment Corporation" at the time.  The parties have not addressed whether this property, as its name suggests, was used for the Woodruff Auto Sales business Penco owned during the years at issue.  Neither party has argued that the treatment of this property either contradicts or supports the stipulation that Penco owned Woodruff during the years at issue.

equivalent substitute assets under 21 U.S.C. sec. 853(p).  Id. at 7-10.

On March 14, 2006, Charles Penland pleaded guilty to (i) conspiring to possess cocaine and methamphetamine with intent to distribute in violation of 21 U.S.C. sec. 841(a)(1) and (b)(1)(A); (ii) money laundering in violation of 18 U.S.C. sec. 1956(a)(3)(A), (B), and (C); and (iii) attempting to possess cocaine with intent to distribute in violation of 21 U.S.C. sec. 846.  Plea Agreement, United States v. Penland, No. 7:05-cr-00710-HFF (Mar. 14, 2006), ECF No. 234.  Charles Penland agreed to forfeit whatever interests he had in the properties listed in the agreement.  Id. at 2-5.  The list of properties coincided with the properties the government alleged in the bill of particulars to be forfeitable on conviction and did not include the properties identified as equivalent substitute assets.  The agreement stipulated that the properties on the list were traceable to or were derived from his intentional and willful violations of 21 U.S.C. secs. 846 and 841(a)(1).  Id. at 6.

On the same day, Mary Penland entered into an agreement with the United States in which she agreed to "abandon, quitclaim and forfeit" her interests in the properties the indictment alleged to be forfeitable.  Forfeiture Agreement and Stipulation, United States v. Penland, No. 7:05-cr-00710-HFF (Mar. 14, 2006), ECF No.

236. Penco's assets and receivables were among those properties. Id. at 1-4. She also agreed to execute documents required to transfer clear title to the United States; to assist with resolving claims of third parties to any of the assets; and to provide records, documents, and other materials needed to identify and resolve issues relating to ownership, chain of title, and encumbrances or liens. In exchange, the government agreed to release to her the real property that the bill of particulars identified as equivalent substitute assets. Id. at 5. The agreement did not mention Mary Penland's tax liabilities.

Mary Penland's agreement with the United States also addressed her right to petition for an ancillary hearing under 21 U.S.C. sec. 853(n). She stipulated that she understood that--if not for the agreement--she could have filed a petition for an ancillary hearing under 21 U.S.C. sec. 853(n) to assert any interest she had or claimed to have in the properties alleged to be forfeitable. Id. at 1. She agreed to waive her right to do so. Id. at 4-5.

On June 6, 2006, the U.S. District Court for the District of South Carolina, under Federal Rule of Criminal Procedure 32.2(b)(2), entered a preliminary order of forfeiture as to Charles Penland. The order decreed that, subject to 21 U.S.C. sec. 853(n), Charles Penland forfeited "all right, title and interest" in listed property to the United States. Preliminary

Order of Forfeiture as to Charles W. Penland, Sr., at 3-4, <u>United States v. Penland</u>, No. 7:05-cr-00710-HFF (June 6, 2006), ECF No. 260. Among the listed property were the "business assets and corporate interests of * * * [Penco, Inc.], including but not limited to all monies, inventory, equipment, claims, interests and accounts receivable payable to or received by * * * [Penco, Inc.]". <u>Id.</u> at 8. The preliminary order said that the "United States is not seeking and this Court is not ordering forfeiture of the * * * corporations themselves or the stock of such corporations, at this time."[8] <u>Id.</u> at 9. The preliminary order authorized the court-appointed receiver to "sell or otherwise dispose of" Penco's assets and directed the receiver to hold the proceeds of the sale until entry of a final order of forfeiture. <u>Id.</u> at 10. On motion of the United States, the preliminary order dismissed the allegations that the properties the United States agreed to release to Mary Penland were forfeitable. <u>Id.</u> at 16-17.

---

[8]The preliminary order went on to state: "Accordingly, until further notice, Charles W. Penland, Sr. remains the sole stockholder of the corporations and the owner of the businesses described above." Penco was among the businesses "described above". As we explain below, because the district court entered the preliminary order after the years at issue, this language does not contradict the stipulation that Mary Penland owned Penco during the years at issue. See <u>infra</u> pt. A.

Notice of Deficiency

On December 15, 2006, the IRS issued Mary Penland a notice of deficiency.[9]  The notice stated that the IRS determined (i) that she had deficiencies in tax of $2,048,607 for 1998, $558,401 for 1999, and $686,371 for 2001; (ii) that she was liable for additions to tax under section 6651(a)(1) of $512,401.75 for 1998 and $23,477 for 1999; and (iii) that she was liable for an addition to tax under section 6654(a) of $93,740.61 for 1998.

The IRS determined that Penco did not own Sweet Water Miniature Horses.  The notice of deficiency stated that the IRS therefore made the following changes to Penco's ordinary income:

Changes to Penco's Ordinary Income
Made by the IRS To Reflect That
Penco Did Not Own Sweet Water Miniature Horses

|  | 1998 | 1999 | 2001 |
| --- | --- | --- | --- |
| Eliminating Sweet Water income | ($112,645) | ($118,880) | -0- |
| Eliminating Sweet Water expenses | 175,580 | 327,537 | $152,562 |
| Eliminating depreciation deductions for Sweet Water assets | 662,635 | 316,998 | 99,303 |
| Total | 725,570 | 525,655 | 251,865 |

---

[9]The date on the notice of deficiency is more than three years after Penland filed her income-tax returns.  Generally, the time limit for the IRS to assess tax (and thus for the IRS to issue a notice of deficiency) is three years from the filing of the return, unless certain exceptions apply.  Sec. 6501. Untimeliness of the notice of deficiency is an affirmative defense.  Adler v. Commissioner, 85 T.C. 535, 540 (1985).  The taxpayer must specifically plead it.  Rule 39.  Penland did not raise the question of timeliness in the pleadings (or otherwise), and we do not address it.

The IRS also determined that Penco was not entitled to most of the net section 1231 losses (other than due to casualty or theft) reflected on the Forms 4797 that it had filed with its Forms 1120S for 1999 and 2001.[10]  For 1999, the IRS determined that Penco was entitled to only $595 of the $927,290 loss that it claimed.  For 2001, the IRS determined that Penco was entitled to none of the $37,736 loss that it claimed.  Thus the IRS increased Penco's taxable income by $926,695 for 1999 and $37,736 for 2001.

The IRS determined that section 446 required Penco to use the accrual method of accounting.  As a result of that conclusion, the IRS made two types of determinations.  First, the IRS made the following changes to Penco's ordinary income to reflect Penco's income computed using the accrual method:[11]

---

[10]Penco did not file a Form 4797 for 1998 and did not claim a net sec. 1231 gain or loss.

[11]The parties do not dispute that the amounts of these changes are correct if the IRS was correct in determining that Penco is required to use the accrual method of accounting.  See infra pt. I.

Changes to Penco's Ordinary Income
Made by the IRS to Reflect Penco's Income
Computed Using the Accrual Method

|  | 1998 | 1999 | 2001 |
|---|---|---|---|
| Gross receipts | $271,039 | $2,798,545 | $2,689,373 |
| Expenses | (4,795) | (6,528) | (3,220) |
| Cost of goods sold | 728,434 | 223,783 | 128,125 |
| Total | 994,678 | 3,015,800 | 2,814,278 |

Second, the IRS determined that section 481(a) required Penco to take into account a $3,709,197 adjustment to taxable income for 1998 to prevent duplicating or omitting income or expenses from previous years.

The IRS made other determinations, none of which are in dispute. The IRS determined (i) that Mary Penland failed to report $1,800 of gambling income for 1998;[12] (ii) that she was entitled to a $300 rate-reduction credit for 2001 under section 6428; (iii) that she was not entitled to carry forward a $221,117 net operating loss from 1998 to 1999; and (iv) that the amounts she claimed for personal-exemption deductions should be reduced by $2,700 for 1998, $2,750 for 1999, and $2,900 for 2001.

---

[12]Penland raised the gambling-income issue for the first time in her reply brief. She did not raise the issue in her petition, and she presented no evidence or argument on the issue at trial. Issues not raised in the petition are deemed conceded. Rule 34(b)(4). So we need not address this issue.

OPINION

The taxpayer generally has the burden of proving that the IRS's determinations described in the notice of deficiency are wrong. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). But section 7491(a)(1) imposes the burden of proof on the IRS if the taxpayer introduces credible evidence and satisfies the conditions of section 7491(a)(2). The taxpayer bears the burden of proving that the conditions in section 7491(a)(2) have been satisfied. See Rolfs v. Commissioner, 135 T.C. 471, 483 (2010). Penland failed to do so for any factual issue and thus bears the burden of proof.

A.   Mary Penland Owned All Shares of Penco, Inc., an S Corporation, During the Years at Issue--1998, 1999, and 2001.

Mary Penland now asserts that her husband, Charles Penland, owned Penco during 1998, 1999, and 2001, an assertion that contradicts paragraph 4 of the stipulation. Paragraph 4 states that "throughout the years at issue petitioner [Mary Penland] was the sole owner of Penco, Inc." As we explain below, we will not permit her to contradict the stipulation.

Stipulations are generally treated "as conclusive [admissions]". Rule 91(e). However, we will disregard stipulations where the facts as stipulated are "clearly contrary to facts disclosed by the record". Jasionowski v. Commissioner,

66 T.C. 312, 318 (1976).  Such circumstances are not present here.

The record does not contradict the stipulation.  Indeed the record supports it:  Penco's corporate records report that Mary Penland was its sole shareholder.  Penland argues that Penco's assets could not have been forfeited unless Charles Penland owned Penco.  But even if he owned Penco at the time of the forfeiture in 2006, the issue here is whether Mary Penland owned Penco in 1998, 1999, and 2001.  And the weight of the evidence in the record supports the stipulation that she owned Penco in those years.

Because the stipulation is not clearly contrary to the facts disclosed by the record, there is no basis for us to disregard it.  See id.  We therefore conclude that Mary Penland owned Penco during the years at issue, as stipulated.[13]

B.    Penco Owned Woodruff Auto Sales, a Sole Proprietorship, During the Years at Issue--1998, 1999, and 2001.

Mary Penland next asserts that Penco did not own Woodruff Auto Sales during the years at issue.  This assertion contradicts paragraph 14 of the stipulation, which states that Charles

---

[13]Sec. 1366(a)(1) taxes S corporation shareholders on their proportionate shares of the S corporation's income.  Thus Mary Penland, as sole shareholder, is taxed on her 100-percent share of Penco's income for the years at issue.

Penland transferred Woodruff to Penco in 1998.[14]  Again, we see no reason to allow Mary Penland to contradict her stipulation that Woodruff was transferred to Penco in 1998.

This stipulation is uncontradicted by the facts disclosed in the record.  See id.  The documentary evidence on which she bases her claim that Penco did not own Woodruff Auto Sales is a solitary inadmissible document.[15]  She also relies on her own testimony and Charles Penland's testimony.  We do not believe them:  their testimony was evasive and curiously unsupported by documents.  On the other hand, documents in the record support the stipulation that Woodruff was transferred to Penco.  For example, Penco's tax returns, which Mary Penland signed, report income from Woodruff for each year at issue.

Again, because the stipulation is not clearly contrary to the facts disclosed by the record, there is no basis for us to disregard it.  See Jasionowski v. Commissioner, supra at 318.  We therefore find that Penco owned Woodruff Auto Sales in 1998, 1999, and 2001, as stipulated.

---

[14]The record does not reveal the date of the transfer in 1998.  Mary Penland has not argued or presented evidence that any part of the income reported on Penco's returns for Woodruff Auto Sales was attributable to times in 1998 before the transfer.

[15]The IRS objected to Exhibit 25-P at trial.  The Court took the objection under advisement and later issued an order excluding the exhibit from evidence.

C.  Penco Did Not Own Sweet Water Miniature Horses, Inc., During the Years at Issue--1998, 1999, and 2001.

The notice of deficiency reflected the IRS's determination that Penco did not own Sweet Water Miniature Horses during 1998, 1999, and 2001.  Mary Penland contended in her petition that Penco owned Sweet Water.  Yet she gave no evidence that Penco owned Sweet Water, and her husband testified that it did not.  She concedes the issue in her posttrial reply brief.[16]  But even if she had not, the record compels the conclusion that Penco did not own Sweet Water during 1998, 1999, and 2001.

D.  The IRS's Disallowance of Penco's Net Section 1231 Losses (Other Than Due to Casualty or Theft) Was Proper.

The IRS disallowed net section 1231 losses (other than due to casualty or theft) of $926,695 for 1999 and $37,736 for 2001.  Penland--who has the burden of proof--offered no evidence that Penco was entitled to these losses.  We therefore uphold the IRS's determination.

E.  Mary Penland Is Not Entitled To Carry a Net Operating Loss From 2000 to the Years at Issue--1998, 1999, and 2001.

Mary Penland claims that she is entitled to carry a purported net operating loss from 2000 to the years at issue, reducing her deficiencies.  A taxpayer can generally deduct a net operating loss for one year from taxable income in each of the preceding two years (as a "net operating loss carryback") and

---

[16]It says:  "Penco, Inc. did not and has never owned the corporation Sweet Water Miniature Horse Farm, Inc."

- 18 -

then in each of the following 20 years (as a "net operating loss carryover").  Sec. 172(a) and (b)(1).  A net operating loss is carried to the earliest possible tax year first; any excess is then carried to the next earliest year, and so on.  Sec. 172(b)(2).

Mary Penland, however, gave no evidence that she had a net operating loss in 2000.  She asserts that copies of various federal and South Carolina amended tax returns for the years at issue are evidence of the loss.[17]  But merely claiming a deduction on a return is not enough to substantiate the deduction.  Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); see also Lawinger v. Commissioner, 103 T.C. 428, 438 (1994); Halle v. Commissioner, 7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949); Taylor v. Commissioner, T.C. Memo. 2009-235.

We therefore hold that Mary Penland is not entitled to deductions for net operating loss carrybacks from tax year 2000 to tax years 1998 and 1999.  And we hold that Mary Penland is not entitled to a deduction for a net operating loss carryover from tax year 2000 to tax year 2001.

F.   Mary Penland Did Not Pay Her Tax Liabilities by Abandoning Her Rights to Penco's Assets.

Mary Penland asserts that she paid her tax liabilities by abandoning her rights to Penco's assets.  In her words:

[17]The parties dispute whether Mary Penland filed the amended returns.  We need not resolve the issue.

Due to the federal forfeiture of Penco, Inc., and its transfer into receivership, the Petitioner's tax liability, should there actually be one, has been paid when the company went into receivership. [Citation omitted.] The Internal Revenue Service cannot collect taxes after that tax has already been paid.

Mary Penland, however, abandoned her rights to Penco's assets in exchange for the release of other properties to her.[18] The government did not agree to apply the value of any of the properties to her tax liabilities. Indeed, no document from the forfeiture proceedings purported to address the amounts of her tax liabilities.

Mary Penland also argues that the IRS was an "unsecured creditor" in the 2006 forfeiture proceedings and that those proceedings therefore discharged her tax liabilities.[19] But unlike a chapter 7 bankruptcy proceeding, in which a court

---

[18]She agreed to "abandon, quitclaim and forfeit all of her right, title and interest in * * * [business assets and corporate interests of] * * * [Penco, Inc.] including but not limited to all monies, claims, interests and accounts receivable payable to or received by [Penco, Inc.]". She waived her right to assert an interest in Penco through the filing of a petition under 21 U.S.C. sec. 853(n). And she agreed to execute documents required to transfer clear title to the United States; to provide records, documents and other materials needed to identify and resolve issues relating to ownership, chain of title, and encumbrances or liens; and to assist with resolving claims of third parties to any of the assets. In exchange, the government agreed to release the real property that the bill of particulars identified as equivalent substitute assets.

[19]The reply brief at 9 states: "The debt has been discharged for federal income tax purposes." At 34 the reply brief states: "The Honorable Judge Floyd further ruled that the IRS' tax assessment claims are washed away as the IRS is still an unsecured creditor in this matter", and "All claims by unsecured creditors are washed away during a criminal forfeiture."

typically discharges prebankruptcy debts, see 11 U.S.C. sec. 727(b), the criminal-forfeiture proceeding against Charles Penland resulted in no order discharging his debts or those of his wife.

G.   The Receiver Appointed To Manage Penco's Assets Did Not Assume Mary Penland's Income-Tax Liabilities.

Penland also asserts that the receiver appointed by the district court to manage Penco's assets is liable for Mary Penland's income-tax liabilities for 1998, 1999, and 2001. The receiver managed Penco's assets until entry of the final order of forfeiture. One might speculate that the receiver assumed Penco's liabilities along with managing Penco's assets. But Mary Penland gave no evidence that this occurred. Besides, Mary Penland's liabilities--including her liabilities for income taxes--are not Penco's liabilities. See Moline Props., Inc. v. Commissioner, 319 U.S. 436 (1943). Thus an assumption of Penco's liabilities would not necessarily be an assumption of her liabilities. Furthermore, even if the receiver had somehow assumed Mary Penland's tax liabilities, she has not explained how that assumption would relieve her of liability.

H.   The IRS's Determination That Section 446 Required Penco To Use the Accrual Method of Accounting Was Not an Abuse of Discretion.

Generally, a taxpayer must compute taxable income under the "method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Sec.

446(a). But if the taxpayer's method does not clearly reflect income, section 446(b) requires the taxpayer to use the method that "in the opinion of the Secretary, does clearly reflect income." The IRS has broad discretion in determining which method clearly reflects income. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979). A court must uphold the IRS's determination unless the determination was an abuse of discretion. See id.; Prabel v. Commissioner, 882 F.2d 820, 823 (3d Cir. 1989), affg. 91 T.C. 1101 (1988); Exxon Mobil Corp. v. Commissioner, 114 T.C. 293, 324 (2000).

Penland argues that the IRS's past failure to challenge Charles Penland's accounting method for Woodruff Auto Sales estops it from challenging Penco's accounting method.

The IRS is not estopped from challenging Penco's accounting method for Woodruff Auto Sales. The IRS may challenge a taxpayer's accounting method for a particular tax year even though it did not challenge the method for a previous tax year. Ezo Prods. Co. v. Commissioner, 37 T.C. 385, 391 (1961); see also Caldwell v. Commissioner, 202 F.2d 113, 115 (2d Cir. 1953). Besides, the taxpayers are different: Charles Penland owned Woodruff before 1998, and Penco owned Woodruff during and after 1998.

We therefore turn to whether the IRS abused its discretion by requiring Penco to use the accrual method.

Penland has not shown that the IRS abused its discretion. Penco was required to use the accrual method by the regulations under section 446. Those regulations require businesses that need to take inventories to use the accrual method of accounting for purchases and sales unless otherwise authorized by the IRS. Sec. 1.446-1(c)(2)(i) and (ii), Income Tax Regs. Inventories are necessary for a seller of merchandise. See sec. 1.471-1, Income Tax Regs.; see also sec. 1.446-1(a)(4)(i), Income Tax Regs. Penco owned Woodruff Auto Sales, a used-car dealership, and the sale of merchandise--used cars--was Penco's main source of income.[20] Thus the regulations required Penco to use the accrual method unless otherwise authorized by the IRS. See also Smith v. Commissioner, T.C. Memo. 1983-472 (holding that the regulations required used-car dealer to use the accrual method). The IRS did not authorize Penco to use a cash method.

We therefore conclude that Penco is required to use the accrual method as described in the notice of deficiency.

I.   The IRS's Determination That Penco Must Take Into Account a Section 481(a) Adjustment for 1998 Was Improper.

As discussed above, the IRS made two types of determinations on account of the change in Penco's accounting method. First, the IRS made changes to Penco's ordinary income in each year to

---

[20]Mary Penland argued that Penco did not need to use accrual accounting because it did not own Woodruff Auto Sales. We reject this argument because we find that Penco owned Woodruff during the years at issue.

reflect what Penco's income would be if it were computed using the accrual method. Second, the IRS determined that section 481(a) required Penco to take into account a $3,709,197 adjustment to taxable income for 1998.[21]

The petition does not assign error to the amounts of the changes the IRS made to reflect what Penco's income would be if it were computed using the accrual method. And Mary Penland did not argue at trial or on brief that these amounts were in error. Mary Penland has thus conceded that if Penco must use the accrual method of accounting--as we have held that it must--the changes are correct. See Rule 34(b)(4) ("Any issue not raised in the assignments of error shall be deemed * * * conceded.").

_____

[21]Sec. 481(a) provides:

SEC. 481(a). General Rule.--In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")--

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

The IRS now concedes that section 481(a) does not require Penco to adjust taxable income for 1998 because Penco did not own Woodruff Auto Sales in 1997.  Section 481(a) does not require an adjustment in a given year unless the taxpayer used a different method of accounting in the previous year.  Sec. 481(a)(1).  Thus section 481(a) does not require an adjustment if a different taxpayer owned a business in the year before a change in accounting method.  See, e.g., Ezo Prods. Co. v. Commissioner, supra at 394 (holding that section 481(a) did not require adjustment because a corporation, which received the assets and the liabilities of a partnership in a tax-free exchange, was not the same taxpayer as the partnership or the partners for section 481(a)(1) purposes); Estate of Biewer v. Commissioner, 341 F.2d 394 (6th Cir. 1965) (holding that section 481(a) did not require adjustment because the decedent was a different taxpayer than the estate for section 481(a)(1) purposes), affg. 41 T.C. 191 (1963).  Such is the case here:  Charles Penland--not Penco--owned Woodruff in 1997, the year before the change in accounting.

J.    Additions to Tax

The IRS determined that Mary Penland is liable for additions to tax under section 6651(a)(1) for 1998 and 1999.

The IRS has the burden of producing evidence that a taxpayer is liable for additions to tax.  Sec. 7491(c).  The IRS satisfies its burden if it produces "sufficient evidence indicating that it

is appropriate to impose" the addition to tax.  Higbee v.
Commissioner, 116 T.C. 438, 446 (2001).  Once the IRS satisfies
that burden, the taxpayer has the burden of persuading the fact
finder that the taxpayer is not liable for the addition to tax
because, for example, the taxpayer qualifies for an exception.
Id. at 446-447.

If a taxpayer is late in filing a return, section 6651(a)(1)
imposes an addition to tax unless the taxpayer had reasonable
cause for failing to file on time and the taxpayer's willful
neglect did not cause the delay.  For each month the taxpayer is
late, the addition is 5 percent of the tax due,[22] up to 25 percent.
Sec. 6651(a)(1).  If a return is more than 60 days late, the
minimum addition under section 6651(a)(1) is the lesser of $100 or
the tax due.  Sec. 6651(a).

The IRS met its burden of production for imposing additions
to tax under section 6651(a)(1) for 1998 and 1999.  Mary Penland
filed both returns late:  she filed her 1998 return on September
8, 2003, and she filed her 1999 return on September 22, 2000.

She did not prove that she is excepted from the addition to
tax.  Section 6651(a)(1) excepts a taxpayer from the addition to

_____

[22]For purposes of sec. 6651(a)(1), the tax due is "The
amount of tax required to be shown on the return * * *
reduced by the amount of any part of the tax which is paid on or
before the date prescribed for payment of the tax and by the
amount of any credit against the tax which may be claimed on the
return."  Sec. 6651(b)(1); see also sec. 301.6651-1(d), Proced. &
Admin. Regs.

tax if the taxpayer shows that the delay had reasonable cause and that willful neglect did not cause the delay.  See also sec. 301.6651-1(c), Proced. & Admin. Regs.  But she offered no cause, reasonable or otherwise, for the delays.

We therefore conclude that she is liable for additions to tax under section 6651(a)(1) for 1998 and 1999.

K.   Other Issues

Mary Penland raises several other issues, which, as we explain below, affect neither her deficiencies nor her liability for additions to tax under section 6651(a)(1).

First, she claims that we have deprived her of due process. Yet she does not say--and we do not see--what denial of due process occurred here.

Second, she raises complaints about the district court proceedings.  But even if her complaints were justified, they would not affect her deficiencies.  We lack jurisdiction to provide relief other than "to redetermine the correct amount of the deficiency".  Sec. 6214(a).  We may not enlarge upon that jurisdiction.  Breman v. Commissioner, 66 T.C. 61, 66 (1976); see also sec. 7442.

Third, she states that she is entitled to relief under section 6015, the provision governing innocent-spouse claims. Section 6015 relieves qualifying taxpayers from the joint liability that accompanies the filing of a joint income-tax

return.  See sec. 6015; see also sec. 6013 (providing for filing of joint returns).  Penland did not file a joint return for 1998, 1999, or 2001.  Thus section 6015 is inapplicable here.

Fourth, she argues that by granting her attorney's motion to withdraw we have deprived her of her Sixth Amendment right to counsel.[23]  The Sixth Amendment provides:  "In all criminal prosecutions, the accused shall enjoy the right * * * to have the assistance of counsel for his defence."  The Sixth Amendment has no application in civil proceedings such as deficiency actions in this Court.  See, e.g., Cupp v. Commissioner, 65 T.C. 68, 85-86 (1975), affd. without published opinion 559 F.2d 1207 (3d Cir. 1977).

Fifth, she argues that the IRS's determination of her income-tax deficiencies violates the Double Jeopardy Clause of the Fifth Amendment.  The Double Jeopardy Clause protects criminal defendants from "a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense."  United States v. Halper, 490 U.S. 435, 440 (1989).  The first two of these protections are not at issue because the government never prosecuted Mary Penland.  Nor is the protection against multiple punishments at issue.  The IRS's determination of her deficiencies seeks not to punish her but to recover her

---

[23]In an order dated May 5, 2008, after a hearing on the issue, we granted the motion of Penland's attorney to withdraw.

purported underpayments of tax.  See <u>Ianniello v. Commissioner</u>, 98 T.C. 165, 179 (1992) (citing <u>Traficant v. Commissioner</u>, 884 F.2d 258, 263 (6th Cir. 1989), affg. 89 T.C. 501 (1987)); cf. <u>Dept. of Revenue of Mont. v. Kurth Ranch</u>, 511 U.S. 767 (1994) (holding that a state tax conditioned on commission of a crime and exacted only after arrest for the conduct giving rise to the tax obligation was a "punishment").  And the additions to tax are not punishments for double jeopardy purposes because they are remedial.  See <u>Ianniello v. Commissioner</u>, <u>supra</u> at 184-185 (holding fraud penalty under section 6653 is remedial); <u>Joye v. Commissioner</u>, T.C. Memo. 2002-14 n.9 ("additions to tax such as those under sec. 6651(a)(1) * * * are remedial, and not punitive") (citing <u>Helvering v. Mitchell</u>, 303 U.S. 391, 401 (1932), and <u>Ianniello v. Commissioner</u>, <u>supra</u> at 187).  Thus the determination does not violate the Double Jeopardy Clause.

We have considered the parties' arguments and conclude that those not mentioned are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.